# The MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED STATES, INC. and the Association of International Automobile Manufacturers, Inc., Plaintiffs,

v.

# NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, and Thomas C. Jorling, Commissioner of Environmental Conservation of the State of New York, Defendants,

# American Petroleum Institute, Environmental Defense Fund, and New York State Electric & Gas, Intervenor–Defendants.

No. 92–CV–869.

United States District Court,
N.D. New York.

Jan. 22, 1993.

As Amended Jan. 26, 1993.

---

7. See Conn. General Statutes §§ 52–278a et seq. and 52–279.

**1334**

Kirkland, Ellis Law Firm, Washington, DC (Daniel F. Attridge, of counsel), for plaintiff.

Robert Abrams, Atty. Gen., State of N.Y., Albany, NY (Joan Leary Matthews, Asst. Atty. Gen., Helene G. Goldberger, Asst. Atty. Gen., of counsel), for New York State defendants.

Morgan, Lewis Law Firm, Washington, DC (William H. Lewis, Jr., David Deal, of counsel), for intervenor-defendant, American Petroleum Institute.

Environmental Defense Fund National Headquarters New York City (James T.B. Tripp, of counsel), for intervenor-defendant, Environmental Defense Fund.

Huber, Lawrence Law Firm, New York City (Seth A. Davis, Dana J. Reifler, of counsel), for intervenor-defendant, New York State Elec. & Gas.

Attorneys General of Massachusetts, Maine, Maryland, New Jersey, Rhode Island and Vermont and Long Island Lighting Co., Hicksville, NY, as amici.

MEMORANDUM–DECISION & ORDER

McAVOY, District Judge.

### Table of Contents

I. Introduction ............................................................. 1335
II. Statutory Scheme......................................................... 1336
 A. National Ambient Air Quality Standards ...................................... 1336
 B. Regulation of Motor Vehicle Emissions....................................... 1337
 C. Statutory Preemption....................................................... 1337
 D. Rules of Construction ...................................................... 1338
III. A. California LEV/CF Program ............................................. 1339
 B. Proposed New York Regulations ............................................ 1341
IV. Discussion................................................................ 1341
 A. Count One: "Identicality" .................................................. 1342
 B. Count Two: "Third Vehicles" ............................................... 1343
 C. Count Five: "ZEV" & Limits on California Certified Vehicles .................. 1345
 D. Count Six: "ZEV" & "Third Vehicles" ....................................... 1346
 E. Count Three: California Waiver............................................. 1347
 F. Count Four: "Leadtime" ................................................... 1348
V. Conclusion ............................................................... 1348

## I

In this action the Motor Vehicle Manufacturers Association of the United States, Inc. and the Association of International Automobile Manufacturers, Inc. (Plaintiffs) challenge the amendments to 6 N.Y.C.R.R. Part 218 (Part 218 Regulations) which were recently promulgated by the New York State Commissioner of Environmental Conservation (Commissioner), and seek a permanent injunction against their enforcement. These amendments were promulgated to address New York State's critical air pollution problems by imposing strict tailpipe emission controls on new motor vehicles sold in New York State. Plaintiffs claim that the Part 218 Regulations are preempted by § 177 of the federal Clean Air Act (the Act), 42 U.S.C. § 7507.

The complaint contains six counts. First, Plaintiffs challenge that the failure of the Department of Environmental Conservation (hereinafter DEC) to adopt the clean fuels component of California's regulations violates the "identicality" requirement of § 177. Second, the complaint alleges that the DEC's failure to adopt the clean fuels component violates the "undue burdens" and "third vehicles" prohibitions of § 177. The third count alleges that DEC's adoption of California standards which have not yet received a federal waiver is in violation of § 177. Next, the complaint asserts that the New York adoption did not comply with the two year leadtime requirements of § 177. The fifth count alleges that the Part 218 Regulations relating to electric vehicles are in violation of Act's prohibition on indirect sales limits. Finally, the complaint alleges that the Part 218 Regulations relating to zero emission vehicles violates the "third vehicle" prohibition of § 177. Cross motions for summary judgment have been filed by all parties.

Plaintiffs' complaint was filed on July 9, 1992. Soon after the filing of the complaint, the American Petroleum Institute (API), the Environmental Defense Fund (EDF), and New York State Electric & Gas (NYSEG) each moved to intervene in this action as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, or in the alternative, permissively pursuant to Rule 24(b). NYSEG and EDF sought to intervene as defendants on all counts. API sought to intervene as a defendant on counts one and two of the complaint, and as a plaintiff on count three. These motions were referred to Magistrate Judge Ralph Smith for a decision. In an Order dated October 23, 1992 Magistrate Judge Smith granted the motions to intervene as of right as defendants. API's motion to intervene as a plaintiff was denied.

Plaintiffs moved to set aside Magistrate Judge Smith's order granting intervention. In a decision rendered from the bench on December 15, 1992 the court denied Plaintiff's motion to set aside the October 23, 1992 Order. The order denying this motion was signed by the court on December 24, 1992.

Also on December 15, 1992, the court entertained oral argument on the pending motions for summary judgement. Because this case involves novel issues of law, the court departed from its usual practice of rendering decisions from the bench. Having given due consideration to the arguments advanced by the parties, both in their papers and at oral argument, this Memorandum–Decision & Order constitutes the decision of the court.

## II

██ In recent history, the field of environmental regulation has been handled both by the several states and the federal government. Consequently, as with other areas of the law in which there is such concurrent jurisdiction, issues of federal preemption are commonplace. Article VI, cl. 2 of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land." *U.S. Const., Art. VI.* Therefore, where conflicts exist, state laws must yield to the supreme authority of federal law.

Like many other areas of regulation in which state schemes predated their federal counterparts, Congress has not articulated an intent to preempt the entire field of regulating sources of air pollution. Instead, the states have been free to continue such regulation; and in some instances the states are given the responsibility for ensuring compliance with federal standards. However, as will be discussed below the Act does, in certain situations, completely preempt the states from acting, and in some instances narrowly proscribes how a state may act.

## A

In the 1970 amendments to Title I of the Act, Congress directed the Administrator of the Environmental Protection Agency (EPA) to develop national ambient air quality standards (NAAQS) for pollutants which the Administrator determines "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408. The Administrator has developed NAAQS that limit the concentrations of six pollutants: carbon monoxide (CO), lead, nitrogen dioxide ($NO_2$), sulfur dioxide ($SO_2$) and particulates. However, the Act places primary responsibility for attaining and maintaining the NAAQS with the states. 42 U.S.C. § 7410 (§ 110 of the Act). The Act requires the states to achieve these NAAQS according to specific timetables. To ensure compliance, Congress requires the states to adopt and submit to the EPA administrator a "state implementation plan", or SIP, which provides for the "implementation, maintenance, and enforcement of" the NAAQS. 42 U.S.C. § 7410(a)(1)

In the 1990 amendments to the Act, Congress imposed new NAAQS attainment schedules. New York State must now demonstrate a fifteen percent reduction of volatile organic compounds from 1990 baseline emissions by 1996, and a three percent reduction each year thereafter until attainment is reached. 42 U.S.C. §§ 7511a(b)(1), 7511a(c)(2)(B). In addition to the VOCs reduction requirements, the amendments included ozone reduction requirements. Twenty-two counties in New York are in nonattainment of the ozone NAAQS. Other areas of the State, specifically the New York City metropolitan area and the Syracuse area, are in nonattainment of the CO NAAQS. New York must comply with the CO NAAQS by 1995 and the ozone NAAQS by 2007.

New York State is required to submit a revised SIP which contains enforceable measures to achieve the required reductions. 42 U.S.C. § 7511a. Also, under these amendments the revised SIP must include an enhanced Inspection and Maintenance (I/M) program for the reduction of emissions from in-use motor vehicles registered in certain urban areas. 42 U.S.C.

§ 7511a(c)(3)(A).[1] The minimum requirements for this enhanced I/M program are prescribed by statute. 42 U.S.C. § 7511a(c)(3)(C). New York's failure to comply with these mandates will result in the imposition of sanctions by the EPA. 42 U.S.C. § 7509.

### B

Motor vehicles primarily emit three pollutants—CO and two precursors of ozone, volatile organic compounds (VOCs) and nitrogen oxides ($NO_x$). CO is a primary pollutant that is directly emitted in vehicle exhausts, and it presents a health risk because it prevents the transfer of oxygen to the blood stream. Ground level ozone, a component of urban smog, is a pollutant that is formed from a variety of chemical reactions involving VOCs and $NO_x$ in the presence of sunlight. Because of the higher temperatures in the summer months, the formation of ozone is greater at that time of year. Unlike the ozone in the upper atmosphere which is beneficial, ground level ozone is harmful to humans and the environment. VOCs are vapors emitted from substances such as gasoline and solvents.

Congress has assigned chief responsibility for the regulation of new motor vehicle emissions in the United States to the EPA. Two of the primary purposes of preempting this field of regulation were to ensure uniformity throughout the nation, and to avoid the undue burden on motor vehicle manufacturers which would result from different state standards. The 1970 amendments to the Act gave the administrator of the EPA the authority to publish mandatory vehicle emission standards for new motor vehicles. 42 U.S.C. § 7521. Manufacturers, in turn, are required to warrant compliance with these standards throughout the useful life of the vehicle. 42 U.S.C. § 7541.

Regulations adopted by the EPA pursuant to 42 U.S.C. § 7525 require automobile manufacturers to demonstrate that their vehicles will comply with these standards prior to the sale of each new model. 40 C.F.R. § 86.078–3 et seq. This process, known as "certification", involves the testing of prototype vehicles made available by the manufacturers to the EPA. The gasoline used in this initial testing is called "certification gasoline" or "certification fuel". The certification fuel used by the EPA is commonly referred to as "indolene" fuel, and is relatively cleaner than most commercially available fuels.

However, after the vehicles for a given model year have been sold to the public, the EPA obtains a sample of "in use" vehicles and conducts tests similar to the certification testing. If, based upon the results of this "in use" testing, the administrator of the EPA determines that a class of vehicles does not conform to the vehicle emission standards he or she may order a recall of such vehicles at the manufacturer's expense. 42 U.S.C. § 7541(c); see also General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 21 ERC 1529 (D.C.Cir.1984), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). State I/M programs also support the effort to ensure that vehicles comply with emission standards. The purpose of these programs is to ensure that vehicles are properly maintained in customer use. 57 Fed.Reg. 31,-057, 31058 (July 13, 1992). Because of the manufacturer's warranties discussed above, when a vehicle fails the state inspection the repairs are often done at the manufacturer's expense.

### C

The 1970 amendments to the Act preempted states from enacting their own vehicle emissions standards. 42 U.S.C. § 7543 (§ 209(a) of the Act). Congress did however create an exception for states which had adopted standards for the control of emissions from new motor vehicles prior to March 30, 1966. 42 U.S.C. § 7543(b). The practical effect of this was

---

1. Section 207(b) of the Act, 42 U.S.C. § 7541(b), directs the administrator of the EPA to establish tests for use in state I/M programs which could identify vehicles that exceed emission standards. As will be discussed below, these I/M programs are an integral part of the effort to ensure compliance with vehicle emission standards.

to create an exemption only for the State of California since it was the only state to have enacted standards for new vehicle emissions. In order to take advantage of this exception, however, California must apply for a waiver from the EPA Administrator.[2] With this exception to preemption, California has had greater avenues open to it for attaining and maintaining the NAAQS.

Prior to 1977, New York was limited in the avenues that it could pursue to meet the NAAQS. However, in that year Congress enacted § 177 of the Act, 42 U.S.C. § 7507, which altered the preexisting preemption rule. § 177 allows states to "adopt and enforce for any model year standards relating to control of emissions from new motor vehicles ... if:

> "(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and (2) California and such State adopt such standards at least two years before commencement of such model year ..."

42 U.S.C. § 7507.

One of the principal reasons for the adoption of § 177 was that by 1977 only a few states had met the NAAQS for ozone, and many others had failed to meet the carbon monoxide standard. § 177 gives these nonattainment states the option of adopting the California vehicle emissions program to support their efforts to comply with the ozone and carbon monoxide standards.

■ In the 1990 amendments to the Act, Congress added a caveat to the § 177 exception to § 209 preemption. The caveat which was added reads as follows:

> "[n]othing in this section ... shall be construed as authorizing any such state to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of

creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such third vehicle." 42 U.S.C. § 7507 (West Supp.1992).

The purpose of this additional restriction on the states' ability to adopt motor vehicle emissions standards was obviously to protect the automobile industry from the undue burden of potentially having to produce 51 different vehicles.

### D

■ The issues presented on the cross-motions for summary judgment require interpretation of the statutory scheme just explained. Unfortunately, no court has confronted the issues presented in this case. Therefore, the court must look to well established principles of statutory construction to resolve the issues presented. Certainly, where the language of the statute to be interpreted is clear the court must go no further. *State of Connecticut v. U.S. Environmental Protection Agency*, 656 F.2d 902, 909, 16 ERC 1467 (2d Cir. 1981). However, the purpose of heeding the literal language of the statute is to give effect to the intent of Congress. *Lewis v. Grinker*, 965 F.2d 1206, 1215, 37 Soc.Sec. Rep.Ser. 439 (2d Cir.1992) ("[w]e can never forget that what we are searching for is Congressional intent.").

■ As is often the case, the Congressional enactments at issue here represent a compromise between competing objectives. The result therefore is that different provisions of the same statute further different Congressional aims. From the language of the Act, it is clear that Congress sought to achieve two goals in enacting and amending the Clean Air Act. It cannot be disputed that Congress sought to permit state regulation of new motor vehicle emissions. However, in doing so Congress expressed a

---

**2.** 42 U.S.C. § 7543(b)(1) provides in pertinent part: No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State Standards to meet compelling and extraordinary conditions, or
(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

clear intent to protect motor vehicle manufacturers from the undue burden of complying with more than two different regulatory schemes. Having carefully considered the language of the Act, the court finds that it clearly demonstrates a congressional intent to balance these competing goals.

## III

### A

The California Air Resources Board (CARB) is the California agency charged with the development and implementation of the State's independent vehicle emissions control program as authorized by § 209 of the Act. In 1988 the California legislature passed a series of amendments to the California Health & Safety Code (the California Clean Air Act of 1988). In part, the California Clean Air Act of 1988 expanded CARB's authority to adopt motor vehicle fuel specifications that would regulate the composition of vehicular fuels.

In 1990 CARB began to develop the regulatory program at issue in this case, the "Low Emission Vehicle/Clean Fuels" program (LEV/CF). The LEV/CF rules regulate not only the emission levels allowed from vehicles, but they also regulate the composition of the fuels which will be sold in California. The LEV/CF program adopted by California includes three basic components. First, it includes new levels of emissions standards. Light duty vehicles, i.e. passenger cars and light duty trucks, are categorized based upon these new emission standards. In order of increasing stringency, these categories are transitional low-emission vehicles (TLEVs), low-emission vehicles (LEVs), ultra-low emission vehicles (ULEVs), and zero-emission vehicles (ZEVs) (collectively referred to as the LEV standards or LEV categories).[3]

As explained in the affidavit of Tom Cackette, Chief Deputy Executive Officer of CARB, the LEV/CF regulations include annually descending fleet average requirements which begin with the 1994 model year. The development of the descending fleet average requirements was based upon an implementation schedule which sets forth the phase-in percentages for each LEV category.[4] However, with the exception of ZEVs, manufacturers are not required to comply with the phase-in percentages listed in the implementation schedule. Rather, a market based approach was adopted in which manufacturers may produce for sale in California any combination of the low emission vehicle categories so long as the overall fleet average requirement is met.

Mr. Cackette further explains in his affidavit that additional flexibility is offered through the creation of a marketable credit system. Manufacturers which produce more low emission vehicles than necessary to meet the fleet average requirements will earn credits. These credits may be re-

**3.** For passenger cars and small light duty trucks, these standards are:

| Category | NMOG * g/mi |
|----------|------|
| TLEV | 0.25 |
| LEV | 0.125 |
| ULEV | 0.075 |

\* non-methane organic gases.

**4.** Possible Implementation Schedule for Low–Emission Vehicles as Percentages of California Vehicles

| YEAR | TLEVs | LEVs | ULEVs | ZEVs * | Fleet Avg.** |
|------|-------|------|-------|--------|--------------|
| 1994 | 10% | | | | 0.250 |
| 1995 | 15% | | | | 0.231 |
| 1996 | 20% | | | | 0.225 |
| 1997 | | 25% | 2% | | 0.202 |
| 1998 | | 48% | 2% | 2% | 0.157 |
| 1999 | | 73% | 2% | 2% | 0.113 |
| 2000 | | 96% | 2% | 2% | 0.073 |
| 2001 | | 90% | 5% | 5% | 0.070 |
| 2002 | | 85% | 10% | 5% | 0.068 |
| 2003 | | 75% | 15% | 10% | 0.062 |

\* ZEV percentages are mandatory.

\*\* measured in g/mi of NMOG.

tained for future use, or traded or sold to other manufacturers. The regulations permit certification of vehicles under the LEV standards as early as the 1992 model year. Certification of vehicles in the 1992 and 1993 model years will provide manufacturers with credits which can be used in 1994 model year when the fleet average requirements become effective.

The second component of the LEV/CF program is a ZEV sales mandate. Starting with the 1998 model year, this mandate requires two percent of the light duty vehicles produced and delivered for sale in California by each large volume manufacturer to be ZEVs. As indicated above, this percentage increases to five percent in 2001, and ten percent in 2003.

The final component of the LEV/CF program is a set of requirements to ensure the availability of clean fuels designated by vehicle manufacturers for the operation of vehicles designed to meet the LEV standards when operated on such fuels. The LEV/CF regulations allow manufacturers to choose from a slate of different "certification fuels" in designing vehicles for certification under the new emissions standards. Specifications were approved by CARB in November, 1991 for reformulated gasoline. This is referred to as "Phase 2" reformulated gasoline because it represents a second generation of California's clean gasoline rules. Following the November, 1991 CARB hearings, Phase 2 reformulated gasoline was added to the slate of clean fuels available to manufacturers. The addition of Phase 2 gasoline to the list of fuels provides manufacturers with yet another option for attaining the LEV/CF emission standards. Phase 2 reformulated gasoline regulations will apply to all fuel commercially sold in California beginning in March, 1996.

As explained in the Cackette affidavit, since 1971 CARB has administered a program that establishes restrictions on the characteristics of vehicular fuels commer-cially sold in California. According to Mr. Cackette, these standards have traditionally been "viewed as wholly distinct from the motor vehicle emission standards." *Cackette affidavit* at ¶ 17. However, with the LEV/CF program CARB has approached the vehicle and its fuel as an integrated system. CARB concluded that "the use of alternative fuels, and improvement in the composition of gasoline and other fuels, could play a substantial role in achieving the greatest possible reductions in motor vehicle emissions." *Id.* at ¶ 18. The LEV/CF program established new, more stringent emission standards. However, it also provided manufacturers with a structure in which they could meet these new standards "not just with improved emission control hardware on the vehicle, but also by accompanying improvements of the emission controls on the vehicle with changes in the fuel." *Id.*

CARB also recognized that the emissions control performance of the vehicles will depend in part on the performance of a small computer under the hood of the vehicle which controls the operation of the engine. Therefore, the regulations require new vehicles to include an onboard diagnostic system, referred to as OBD II, which performs an emissions diagnostic function. This system alerts the operator of possible malfunctions of emissions hardware and records relevant data for interpretation by service personnel.[5] CARB adopted these rules to aid owners and mechanics in identifying component failures. Additionally, these new regulations aid the state's I/M program in monitoring continued compliance throughout the useful life of the vehicle.

In sum, LEV/CF is an integrated program adopted by the State of California in order to reduce motor vehicle emissions. Plaintiffs point to various CARB resolutions and reports which indicate that the premise behind the LEV/CF program is that the vehicle and its fuel are considered

---

**5.** Under the rules adopted by CARB, the onboard computer must monitor the hydrocarbon conversion efficiency of the vehicle's catalytic converter. The efficiency monitoring function will require the OBD system to warn the operator of a malfunction whenever the conversion efficiency falls below 50%.

as a single system. As noted above, past regulations generally established requirements for the vehicle and the fuel separately. This program therefore represented a significant change from earlier California emissions regulation programs.

As required by § 209(b) of the Act, California must obtain a waiver from the Administrator of the EPA before it can enforce its LEV/CF program. CARB forwarded the first portion of its program, the initial exhaust emission limits and the initial clean fuel rules, to EPA for review in October, 1991. Additional waiver submittals are expected after CARB completes work on other portions of the LEV/CF program. The October, 1991 submittal has been highly controversial. Plaintiffs and intervenor-defendant, API challenged portions of the request in January, 1992. However, on January 7, 1993 the LEV/CF program received EPA approval.

**B**

As indicated above, in the 1990 amendments to the Act, Congress imposed strict NAAQS attainment schedules. Consequently, in order to meet these schedules New York has been forced to adopt aggressive ozone and CO reduction measures. According to DEC, the measures taken thus far have been insufficient to meet the ozone and CO NAAQS without implementation of additional measure to address motor vehicle emissions.

■ Pursuant to § 177 of the Act, DEC began its rulemaking to adopt the California LEV/CF program in March, 1991. The final rules were promulgated by DEC in May, 1992. New York has thus far adopted two sets of California standards as part of its Part 218 Regulations. It has adopted the 1993 standards, and the LEV standards, including the ZEV sales mandate. New York has not adopted the clean

fuel requirements of the LEV/CF program, or specifically enacted the onboard diagnostics rules. However, 6 N.Y.C.R.R. § 218.-2.2 provides that "[o]nly vehicles which are certified to the following California standards ... may be sold in New York." Therefore, the onboard diagnostic rules are incorporated by reference.

The standards referred to in this section are the "emission" standards contained in the LEV regulations. Additionally, DEC adopted the fleet average emission values contained in the LEV/CF program. Based upon the results of three NESCAUM[6] studies, and DEC's additional research, DEC determined that the adoption of California's standards will significantly reduce air pollution in the most cost-effective manner under current conditions.[7]

**IV**

In their motion for summary judgment, Plaintiffs advance three arguments in support of their claim for declaratory and injunctive relief. They argue that DEC's failure to adopt the clean fuels component violates § 177 in two ways: (1) it violates the "identicality" requirement of § 177(1); and (2) it violates the "third vehicle" prohibition contained in the 1990 amendment to § 177. The second argument advanced by Plaintiffs is that the ZEV sales mandate adopted by DEC will restrict the sale of other California certified vehicles in New York, and it will require the production of a "third vehicle", both in violation of the 1990 amendment to § 177. Finally, Plaintiff's argue that DEC's adoption of the California LEV standards violates the timing requirements of § 177.

The standard applicable to a motion for summary judgment is familiar. Such a motion should be granted when the papers "show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of

---

**6.** NESCAUM (Northeast States for Coordinated Air Use Management) is an interstate association of the air quality control agencies of the eight member states: Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Vermont.

**7.** It is worth noting that the member states of the Northeast Ozone Transport Commission (OTC), which is composed of twelve states along the eastern seaboard from Virginia to Maine, have adopted a memorandum of understanding that committed them to pursuing the adoption of California LEV standards.

law." Fed.R.Civ.P. 56(c), *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, there are no genuine issues of any material facts, rather the sole issues for resolution are questions of law which must be decided by the court, and not a reserved for the trier of fact.

### A

The first issue to be resolved is the scope of the "identicality" requirement of § 177. Exactly what "standards" must be identical to those adopted by California is the central focus of this inquiry. Section 177 refers to *"standards relating to control of emissions"*, 42 U.S.C. § 7507. Plaintiffs urge a liberal interpretation which would include the LEV/CF program as a whole, including the clean fuel component. DEC and the intervening defendants suggest that a more narrow construction is appropriate.

The terms "emission limitation" and "emission standard" are defined in § 302(k) of the Act as

> "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, *including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction,* and any design, equipment, work practice or operational standard promulgated under this chapter." 42 U.S.C. § 7602(k) (West Supp.1992) [emphasis added].

Plaintiffs point specifically to the italicized language and argue that the California fuels are a component of the emissions standards *"relating to the operation or maintenance of a source to assure continuous emission reduction."* Plaintiffs argue that because the fuels are so integrally related to the continuous reduction of emissions, New York must therefore adopt the program as a complete package.

■ While the LEV/CF program as a whole may fit within the definition contained in § 302(k), the critical statutory section at issue here is § 177. The clear language of § 177(1) provides that a state may adopt and enforce new vehicle emission standards *only* if they "are identical to the California standards *for which a waiver has been granted."* 42 U.S.C. § 7507(1). Certainly, this precondition to a state's adoption and enforcement of such standards is intended to preclude states from taking such action with respect to California standards which have not received EPA approval. The logical corollary to this proposition is that a state *may not* adopt and enforce any California emission standards which have not received such EPA approval.

California's waiver application now pending before the EPA does not include the clean fuels program. Rather it only seeks a waiver for the portion of the LEV/CF program relating to emission standards. Defendants therefore argue that New York may only adopt the emission standards contained in the LEV/CF program. The California fuel regulations which are a part of the LEV/CF program may indeed be requirements related to the operation of new motor vehicles to assure continuous emission reduction. However, § 177(1) does not permit a state to adopt any and all California regulations which may be so related to new vehicle emission reduction. Rather it only permits adoption and enforcement of the California regulations which have received an EPA waiver.

Defendants argue that the use of the word "waiver" in § 177(1) refers only to the waiver obtainable by California pursuant to § 209(b) of the Act. Plaintiffs argue that while the clean fuels component of the LEV/CF program is not directly reviewed by the EPA in its § 209(b) waiver request, California receives an automatic waiver for such fuel requirements. Therefore, it is their position that the use of the word "waiver" in § 177 includes any automatic waiver granted to California.

■ § 211 of the Act generally preempts state enforcement of any motor vehicle fuel regulations. However, § 211(c)(4)(B) of the Act provides that

"[a]ny State for which application of section [209(a) of the Act] has at any time been waived under section [209(b) of the Act] may at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive." 42 U.S.C. § 7545(c)(4)(B).

Therefore, as the only state which has received a waiver of preemption under § 209(b) of the Act, California is excepted from the general prohibition on states enacting fuel regulations, and in effect receives an automatic "waiver" for its clean fuels program. However, there is no indication in this section that nonattainment states such as New York, for which § 209(a) preemption is waived by § 177(1), receive such an automatic waiver. Instead, § 211 provides that such states may avoid preemption in the field of fuel regulation if and only if they first demonstrate to the Administrator of the EPA that a more stringent fuel regulation in the state's SIP is necessary for NAAQS attainment. 42 U.S.C. § 7545(c)(4)(C). Therefore, New York along with forty eight other states do not receive an automatic waiver for clean fuels programs.

■ Congress has separately preempted the regulation of new motor vehicle emissions and the regulation of motor vehicle fuels. Although California's adoption of the LEV/CF program demonstrates that state's intention to treat vehicle emissions and fuel composition as a unit, Congress has demonstrated a clear intent to treat those two subjects differently. As explained above, the regulation of emissions by states other than California is directly linked to actions taken by the State of California and approved by the EPA. However, in the area of fuel regulation there is no such linkage. Notwithstanding the fact that California may automatically receive a waiver for its fuel regulations, States like New York may only obtain a waiver of preemption by making a demonstration of necessity to the EPA administrator. Therefore, under the Act, whether New York may regulate motor vehicle fuels, and how it may do so, depends upon its

need to attain the federally mandated NAAQS.

■ The court finds that the "identicality" requirement of § 177(1) does not require DEC to adopt the clean fuels component of the LEV/CF program. In doing so the court interprets the plain language of § 177(1) as dictating that New York's new vehicle emission standards be identical to those California standards which receive a waiver from the EPA pursuant to § 209(b) of the Act. California's clean fuel regulations receive a waiver pursuant to § 211 of the Act. To hold that New York must also adopt fuel standards for which California has received a § 211 waiver would ignore the apparent Congressional intent to treat these two subjects differently. Consequently, Defendants' cross-motions for summary judgment on the first count of the complaint are granted.

### B

Plaintiffs' next argument is that New York's failure to adopt the clean fuel component of LEV/CF will violate the 1990 amendments to § 177 in that such failure will force the production of a "third vehicle". This is the second count in the complaint. Plaintiffs argue that the California vehicle emission standards set emissions targets that can be met, if at all, only by the use of California clean fuels. They contend that California vehicles certified to the LEV standards will not be able to maintain acceptable levels of catalytic converter efficiency in New York due to the higher levels of sulfur in New York fuels. Consequently, Plaintiffs contend that they will have to design and produce one type of computer for EPA, one for California and "a third" for New York.

■ The 1990 Amendment to § 177 prohibits a § 177 state from taking "any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such third vehicle." 42 U.S.C. § 7507. This language is couched in extremely broad terms, it prohibits *any*

action of *any* kind. Moreover, as indicated above the legislative purpose behind this enactment was to protect the motor vehicle industry from the undue burden of state standards which would force the production of a vehicle different from "federal" or "California" vehicles. Therefore, if the Part 218 Regulations, in any way, have the effect of creating a vehicle of a different design from vehicles designed for sale in California, they are preempted.

■ Defendants are correct in their assertion that California's adoption of clean fuel regulations was intended to reduce emissions in vehicles already in use in California. However, there can be no dispute that this adoption was likewise designed to facilitate manufacturer compliance with the LEV regulations on new motor vehicles produced for sale in California. Nevertheless, in this respect CARB's intent is irrelevant. The only issue here is whether the adoption of the LEV standards without the clean fuel standards will create a situation in which Plaintiffs will be required to design vehicles different from those designed for sale in California. On this count, the court finds for Plaintiffs.

■ As an initial matter, Plaintiffs' argument that the reduction of vehicle emissions in New York will not be as great without the adoption of California's clean fuels must be rejected. Whether, and to what degree, DEC reduces vehicle emissions, and in the broader scheme whether and to what degree DEC attains the NAAQS contained in the 1990 Amendments to the Act, are questions properly left to administrative consideration. DEC is the agency responsible for achieving compliance with the terms of the Act for New York State, and it is not for the courts to second guess any SIP developed to achieve that compliance. Those issues are properly left to DEC and the EPA Administrator.

The remainder of Plaintiffs' arguments on this point have substantial validity. It is clear that the LEV standards adopted by CARB were conceived with the availability of California clean fuels in mind. However, it is unclear from the facts presented, whether it is possible for Plaintiffs to meet

the LEV standards without the availability of such fuels. Indeed, it may be technologically feasible for vehicles to be manufactured and designed which will meet the LEV standards on fuel sold in New York; and Plaintiffs have not demonstrated that these standards cannot be attained. Nevertheless, that is not their burden here. The issue is whether Plaintiffs would have to design vehicles for sale in New York which would be different from the vehicles designed for sale in California.

Defendants first argue that vehicles will only be certified and tested on fuels such as indolene which are cleaner than in-use fuels. The only point at which Plaintiffs' vehicles must comply with the LEV standards is when the vehicle is subject to in-use testing. Since the vehicles will only be tested on fuels such as indolene, Defendants argue there will be no danger of failing the test and being subject to the recall provisions of the Act. Consequently, DEC argues it has not taken any action which would have the effect of creating a third vehicle. Plaintiffs argue that notwithstanding the use of cleaner fuels for certification and testing, the in-use fuels will degrade the performance of the emissions hardware and therefore lead to a loss of efficiency that could in turn result in non-compliance with the LEV standards.

Plaintiffs have presented evidence that the higher sulfur content of New York fuels will impede the effectiveness of catalytic converters designed for sale in California, and will cause the OBD II system to warn the operator of a loss of converter efficiency. If the OBD II system indicates a malfunction prior to the expiration of the warranty period (which under LEV/CF is 100,000 miles), the converter will have to be replaced. Plaintiffs have presented evidence that this will lead to a redesign of the exhaust emission control system. The converter assembly designed for sale in California will be a welded assembly because it is not expected that it will have to be replaced during the warranty period. However, because of the use of higher sulfur fuels in New York, the converters on New York vehicles will need to be re-

placed or repaired earlier. Consequently, Plaintiffs will have to design New York vehicles with a flanged bolted assembly that is removable.

Defendants conceded at oral argument that the efficiency of catalytic converters is affected by the sulfur content of New York fuel. However, they argue that the sulfur impacts on the effectiveness of catalytic converters are not as great as Plaintiffs suggest. Moreover, they argue that the effects are reversible, and therefore there is no permanent effect which would cause a vehicle to fail a recall test. Defendants have presented evidence to support these claims.

These arguments raise two distinct questions: first, whether the sulfur impact will have the effect of putting Plaintiffs in jeopardy of failing recall tests; and second, whether the sulfur impact will have the effect of forcing Plaintiffs to redesign the OBD II system required by the regulations. An affirmative answer to either of these questions would mean that the Part 218 Regulations have the effect of creating a third vehicle.

As to the first question, Plaintiffs have not disputed the temporary nature of the sulfur effects on converter efficiency. The evidence presented by Defendants clearly demonstrates that emissions will return to a lower level when a vehicle is operated on a fuel of lower sulphur content. Since it is clear that recall testing will be conducted with cleaner fuels, Plaintiffs are not placed in jeopardy of failing such in-use tests.

However, the evidence proffered on the second question demonstrates that Plaintiffs are entitled to summary judgment on the second count in the complaint. Defendants concede that higher sulfur fuel impacts on the efficiency of a catalytic converter, but argue that the degradation of efficiency is not as great as Plaintiffs claim. However, the degree of this impact is irrelevant.

As Plaintiffs have argued there are two factors, relevant to this question, which degrade converter efficiency; the sulfur content of the fuel and the vehicle's mileage. Certainly, as a vehicle's mileage increases, its catalytic converter's efficiency will decrease. Consequently, vehicles designed for sale in California will be designed to maintain the appropriate level of efficiency throughout the warranty period. However, when a vehicle is operated on high sulfur fuel, its catalytic converter's efficiency decreases. Therefore, when California designed vehicles are operated for extended periods of time on the high sulfur fuels in New York, the degradation of converter efficiency will be accelerated. The result is that Plaintiffs will have to redesign the exhaust emission control system to take into account the higher sulfur content in New York fuels.

Defendants' next argue that to the extent that sulfur impacts OBD II, lower sulphur fuels are on the horizon. They claim that although New York has not adopted the California clean fuels program, federal reformulated gasoline will be sold in the New York City metropolitan Area by 1995, and DEC expects that it will be sold throughout the state by that time. However, as Plaintiffs point out, there are no restrictions on sulfur content in federal reformulated gasoline until the year 2000. Moreover, there is no evidence that the sulfur content of fuel sold in New York will be restricted prior to that time. Therefore, Plaintiffs are entitled to summary judgment on the second count in the complaint.

### C

Plaintiffs second argument on summary judgment is that the ZEV sales quotas adopted by DEC will violate section 177 by limiting "directly or indirectly" the sale of California certified vehicles. This argument is addressed to the fifth count in the complaint. Plaintiffs claim that the mandatory sales quotas contained in the Part 218 Regulations effectively condition the sale of California certified non-ZEV vehicles on the sale of a specified percentage of ZEV vehicles.

For example, they point out that in 1998, the first year of the ZEV sales mandate, because of the requirement that 2% of the vehicles sold be ZEVs manufacturers

would be restricted to selling 49 California certified non-ZEV vehicles for each ZEV sold or ZEV credit purchased. Therefore, Plaintiffs argue that this sales mandate limits the sale of California certified non-ZEV vehicles in violation of section 177.

In addition, Plaintiffs claim that the lack of extensive sales incentives and other programs to stimulate market demand, along with the colder New York climate will mean that there will be inadequate demand for the "California" built ZEV's. Therefore, the manufacturers will be faced with two equally unattractive options; either meet the sales quotas by reducing the number of non-ZEV vehicles sold in New York, or increase the prices of non-ZEV vehicles and use the additional revenue to buy ZEV credits from another manufacturer. Plaintiffs argue that this constitutes a further limit on the sale of California Certified vehicles in New York.

Defendants first argue that with regard to the ZEV sales requirements it has fully complied with the "identicality" mandate of section 177. Furthermore, they argue that the sales mandate is not a prohibition or limit on sales, but rather an enforcement mechanism. Defendants note that CARB is considering changes to the ZEV requirement which would allow manufacturers to meet the requirement by *producing* the necessary percentages, and that DEC intends to adopt this change. Finally, Defendants contend that there are already federal and State incentives that will spur the sales of ZEVs in New York. Several such incentives and programs are noted in their papers.

■■■ First, the fact that DEC has adopted ZEV mandates which are identical to those adopted by CARB is irrelevant to the issue of whether those mandates constitute a limit on the sale of California certified vehicles. Likewise, the court finds that the existence of incentives, or lack thereof, is irrelevant to whether the Part 218 Regulations constitute a limit on the sale of California certified vehicles. It is not for the court to rule on the adequacy of sales incentives and other market stimulus packages. Finally, even assuming that this is merely an enforcement mechanism, it would still be prohibited if it constitutes a limit on the sale of California certified vehicles.

■■■ The court is convinced that Plaintiffs are entitled to summary judgment on the fifth count. The mandate at issue is no doubt identical to the mandate enacted by CARB. However, the Act does not preclude California from taking any action which would limit the sale of federally certified vehicles, or limit the sale of any class of vehicles. In fact the entire LEV/CF program constitutes such limitations. Rather, the Act precludes § 177 states from taking action which limits the sale of California certified vehicles. By mandating that a certain percentage of California certified vehicles sold in New York fall into a particular class, DEC has effectively limited the sales of all other classes of California certified vehicles.[8] Therefore, Plaintiffs are entitled to summary judgment on the fifth count in the complaint.

## D

Next, Plaintiffs argue that the ZEV sales mandate will require the production of a "third vehicle". Plaintiffs claim that because of the climatic and market differences between California and New York, the ZEV sales mandate will require the production of precisely the type of third vehicles Congress intended to prevent by amending § 177.

Specifically, Plaintiffs argue that technological limitations on the batteries used in electric vehicles have resulted in manufacturers building these vehicles without heaters. Because of the colder climate in New York, they argue that they would be unable to meet the sales quotas for ZEVs without modifying the design of the vehicles. Consequently, they would be forced to include an enhanced heating system, such

---

**8.** The court expresses no opinion on whether a "production" mandate as proposed in California would violate § 177. Because the mandate in the Part 218 Regulations is a "sales" mandate, that question is not properly before the court.

as a fuel fired heater (FFH), which would necessarily require significant and expensive modifications and additional crashworthiness testing. In addition to the heating problem in the passenger compartment, the manufacturers claim that the batteries themselves must be protected from the colder temperatures, thereby leading to further design modifications. Furthermore, Plaintiffs maintain that at this time there are technological limitations on making these changes.

Defendants respond that the "third vehicle" prohibition relates to how *emission standards* affect the design of the vehicle. All ZEVs are equal with respect to emissions, therefore they argue that options which do not affect emissions are irrelevant to the analysis. Defendants point out that conventional vehicles have differences with respect to items such as heaters and rear window defrosters in order to meet local conditions. Therefore, they argue that acceptance of Plaintiffs' argument would require an analysis of local climate and market conditions, which have nothing to do with vehicle emissions, every time a state wishes to adopt California's emission standards pursuant to section 177. Finally, Defendants have presented evidence that the technological barriers claimed by Plaintiffs are not as great as Plaintiffs suggest.

 The court accepts Defendants argument that differences in climate should not act as a bar to a state's adoption of California's vehicle emission standards. However, the issue here is not simply an emission standard. Rather, the Part 218 Regulations mandate that vehicle manufacturers sell a certain number of ZEVs as a percentage of the total number of vehicles sold. In order to meet this mandate, Plaintiffs will have to produce a vehicle which will satisfy market demand in the State of New York. In fact Defendants recognize that manufacturers design vehicles to satisfy local conditions. To mandate a minimum number of vehicles is to mandate that manufacturers design vehicles to satisfy the demands of local climatic conditions. Therefore, the court finds that ZEV mandate violates § 177, and Plaintiffs are entitled to summary judgment on the sixth count in the complaint.

E

The third count in the complaint alleges that DEC violated section 177 by adopting California standards that had not yet received a federal waiver. Plaintiffs read section 177(1) as meaning that a state may only adopt California standards for which a waiver has been granted, and since no waiver has been granted New York's adoption has been premature.[9] DEC argues that section 177 means that states may adopt and enforce California standards for which a waiver has been granted. DEC claims that it would be illogical to read the Act as allowing California to adopt standards without a waiver, and not allow other states to do the same. Here, the court agrees with Defendants.

 § 209 of the Act clearly preempts states from adopting or enforcing any standards relating to vehicle emissions. However, the § 177 exception to this broad preemptive section provides that a state may "adopt and enforce" such standards if two conditions are met: first, the standards must be identical California standards for which a waiver has been granted; and second, the standards must be adopted at least two years before the beginning of the model year. 42 U.S.C. § 7507. To read this section as preventing adoption of such standards prior to California receiving its waiver would be improper.

A simple example illustrates the absurdity of Plaintiffs' interpretation. Assuming that the 1990 model year commenced on January 1, 1989, California and any § 177 state would have to adopt standards relating to those 1990 vehicles on or before January 1, 1987. If § 177 states could not adopt such standards until after California

9. Although a waiver has been granted by the EPA Administrator, this issue must still be addressed because the waiver had not been granted at the time DEC adopted the Part 218 Regula-tions. The issue here is whether a § 177 state may adopt such regulations before the waiver is granted.

received its waiver, unless the waiver was granted prior to January 1, 1987 those states would be precluded from adopting vehicle emission standards for the 1990 model year. When interpreting a statute the court must give effect to its purpose. The purpose of § 177 was to permit states other than California to regulate vehicle emissions as part of their SIP. Therefore, to effectuate this purpose the court must find in favor of Defendants on the third count in the complaint.

## F

Finally, the fourth count in the complaint alleges that DEC's adoption of the Part 218 Regulations did not comply with the two year leadtime requirement of § 177. First, Plaintiffs argue that § 177 requires that a state electing to adopt the California standards for a particular model year do so "at least two years before commencement of such model year (as determined by regulations of the Administrator)." 42 U.S.C. § 7507(2). As noted above, the final Part 218 Regulations were adopted in May, 1992. Plaintiffs claim that this is less than two years before the commencement of the 1995 model year which according to Plaintiffs begins earlier than May, 1994. They argue that a state's failure to comply with the two year leadtime poses significant problems for the design and production of motor vehicles.

■■■ DEC concedes in its papers that it adopted the 1995 standards 19 months before work would begin on the 1995 vehicles. However, it argues that the court should not find this in violation of the leadtime requirement. First, Defendants argues that the California standards could not realistically have been adopted any earlier. The rulemaking process began only 16 days after California's adoption of the standards, and DEC adopted the regulations only nine months after the initial proposal. DEC asserts that a rulemaking of this magnitude ordinarily takes approximately 18 months. In other words, DEC is arguing that it adopted the regulations as fast as possible. This argument lacks merit.

Plaintiffs argue in their opposition to the cross-motions that DEC's difficulties in this regard are of its own making. However, even if the timing difficulties experienced by DEC were a function of state law, the regulations were not adopted two years prior to the commencement of the 1995 model year. This does not mean that DEC is prevented from adopting emission standards. Instead, it simply prevents enforcement of such standards in the 1995 model year.

■■■ Defendants' next argument is that since New York is required to adopt regulations identical to California's, every time California amends its regulations New York must amend its own. CARB enacted a resolution adopting the LEV regulations for model year 1995 on July 12, 1991. However, since there are no claims that subsequent amendments enacted by CARB caused the delay in promulgating the Part 218 Regulations, this argument is really academic. Therefore, the court declines to express what would in effect be an advisory opinion on this issue.

## V

For the reasons expressed above, the court grants in part and denies in part the motions before it. Because the court finds that the "identicality" requirement contained in § 177 of the Act is limited to the LEV standards contained in the California Program, Defendants' cross-motion for summary judgment on count one is granted. As for the second count in the complaint, the court finds that the Part 218 Regulations, as adopted by DEC, will have the effect of creating a "third vehicle" in violation of § 177. Therefore, Plaintiffs' motion for summary judgment on count two of the complaint is granted.

As for the third count in the complaint, the court finds that the language of § 177 does not preclude § 177 states from adopting California standards prior to those standards receiving an EPA waiver. Plaintiffs' interpretation of the Act, insofar as it relates to this count, is contrary to the plain language of the Act, and would frustrate Congressional intent. Therefore,

summary judgment is granted to Defendants on count three. Nevertheless, Plaintiffs' interpretation of the leadtime provisions of the Act is consistent with the plain language. Because the Part 218 Regulations which apply to the 1995 model year were not adopted two years before the commencement of that model year, summary judgment is granted to Plaintiffs on the fourth count in the complaint.

Finally, the fifth and sixth counts in the complaint pertain to the ZEV sales mandate contained in the Part 218 Regulations. Because the court finds that these regulations will limit the sale of California certified vehicles, and have the effect of creating a "third vehicle", they violate the clear language of the Act. Summary judgment is therefore granted to Plaintiffs on the last two counts in the complaint.

IT IS SO ORDERED.