**AMERICAN AUTOMOBILE MANUFACTURERS ASSOCIATION, Association of International Automobile Manufacturers, Inc. and Massachusetts State Automobile Dealers Association, Inc., Plaintiffs,**

v.

**COMMISSIONER, MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, Defendant.**

**No. 93–10799–ADM.**

United States District Court, D. Massachusetts.

Oct. 15, 1997.

---

**12**

Edward W. Warren, Daniel F. Attridge, Gary E. Marchant, Stuart A.C. Drake, Kirkland & Ellis, Washington, DC, Robert F. Sylvia, Hinckley, Allen & Snyder, Boston, MA, for Plaintiffs.

William L. Pardee, Atty. General's Office, Boston, MA, for Massachusetts Dept. of Environmental Protection, Daniel S. Greenbaum.

William H. Lewis, Hunter L. Prillman, Morgan, Lewis & Bockius, Washington, DC, Paul F. Ware, Goodwin, Procter & Hoar, Boston, MA, Michael J. Meagher, Burns & Levinson, Boston, MA, Scott L. Robertson, Washington, DC, for American Petroleum Institute.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The pending cross motions for summary judgment present the next episode in this case, the parties seeking the latest defining application of the Clean Air Act ("CAA").[1]

---

**1.** Prior decisions involving this matter are set forth in *American Automobile Mfrs. Ass'n v. Commissioner, Massachusetts Dep't. of Envmtl. Protection,* 31 F.3d 18, 22 (1st Cir.1994) and *Ameri-*

42 U.S.C. § 7507 *et seq.* The CAA is the federal statutory scheme governing emissions from gasoline-powered engines, a source of air pollution. A brief outline of that scheme and the present posture of this case will serve as the backdrop against which these motions are considered.

## I. Background

### A. The Clean Air Act

The CAA directs the Environmental Protection Agency (EPA) to establish and enforce national ambient air quality standards ("NAAQS") for pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a). To achieve and maintain these NAAQS by regulating sources of air pollution, each state is required to submit a "state implementation plan" ("SIP") to the EPA for approval. CAA § 110, 42 U.S.C. § 7410(a)(1).

However, states may not promulgate individual motor vehicle emission standards to attain the NAAQS set by the EPA. Section 209(a) expressly preempts all state regulation of motor vehicle emissions. According to § 209(a),

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines.... No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

CAA § 209(a), 42 U.S.C. § 7543. Congress preempted the field of vehicle emission regulation for two reasons: "to ensure uniformity throughout the nation, and to avoid the undue burden on motor vehicle manufacturers which would result from different state standards." *Motor Vehicles Mfrs. Ass'n of U.S.,*

*can Automobile Mfrs. Ass'n v. Greenbaum,* No. 93–10799–MA, slip op., 1993 WL 443946 (D.Mass. Oct. 27, 1993).

*Inc. v. New York State Dep't. of Envtl. Conservation*, 810 F.Supp. 1331, 1337 (N.D.N.Y. 1993) ("*MVMA I*"), *modified on other grounds*, 831 F.Supp. 57 (N.D.N.Y.1993) ("*MVMA II*"), *aff'd in part, rev'd in part*, 17 F.3d 521 (2d Cir.1994) ("*MVMA III*"), *on remand*, 869 F.Supp. 1012 (N.D.N.Y.1994) ("*MVMA IV*"), *order aff'd*, 79 F.3d 1298 (2d Cir.1996) ("*MVMA V*").

There is one exception to the § 209(a) preemption: California is allowed to adopt standards that "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." CAA § 209(b); 42 U.S.C. § 7543(b)(1). Congress provided California with this unique exception to federal preemption because of its extraordinary air pollution problems and because of its pioneering role in the field of emissions control. *MVMA III*, 17 F.3d at 525. Congress, however, did not wholly insulate California from federal preemption. Section 209(b) prevents California from enforcing regulations under this exception until granted a waiver of federal preemption by the EPA.[2]

Prior to 1977, states other than California were limited in the means available to meet the NAAQS. In 1977, however, Congress added § 177 to the CAA, which allows states to adopt the California vehicle emission standards in lieu of the less restrictive federal standards. CAA § 177, 42 U.S.C. § 7507; *see Virginia v. EPA*, 108 F.3d 1397, 1401 (D.C.Cir.1997) (describing California standards as "considerably more restrictive than the federal standards"). Section 177 provides:

Notwithstanding [§ 209(a) ], any State ... may adopt and enforce for any model year standards relating to the control of emissions from new motor vehicles or new motor vehicle engines ... if—(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and (2) California and such State adopt such standards at least two years before com-

mencement of such model year (as determined by regulations of the Administrator).

CAA § 177, 42 U.S.C. § 7507 (1995). Congress restricted states to duplicating either federal or California standards in order "to protect motor vehicle manufacturers from the undue burden of complying with more than two different regulatory schemes." *MVMA I*, 810 F.Supp. at 1339. In short, there can only be two types of cars in this country: "California" cars or "federal" cars. States cannot adopt any other standards which would require automakers to create a "third" car. CAA § 177, 42 U.S.C. § 7507.

### B. *The California ZEV regulations*

The California Air Resources Board ("CARB") is the agency responsible for adopting and administering motor vehicle emissions regulations for the state of California. *MVMA I*, 810 F.Supp. at 1339. Pursuant to its authority under § 209(b), CARB adopted new low emission vehicle (LEV) and clean fuel (CF) regulations ("LEV/CF regulations") in September 1991. The LEV program set forth increasingly stringent emission standards for five types of vehicles: California Tier I vehicles; Transitional Low Emission Vehicles (TLEVs); Low Emission Vehicles (LEVs); Ultra–Low Emission Vehicles (ULEVs); and Zero Emission Vehicles (ZEVs). The California ZEV mandate required the seven largest automobile manufacturers (General Motors, Ford, Toyota, Honda, Nissan, Chrysler and Mazda) to deliver a sales fleet of new vehicles containing at least two percent ZEVs in model year 1998, five percent ZEVs in model year 2001, and ten percent ZEVs in model year 2003. Cal.Code Regs. tit. 13 § 1960.1(g)(2). On January 7, 1993, the EPA approved the LEV program and granted California a waiver of federal preemption under § 209(b) of the CAA.

In 1995, CARB created an independent panel of battery experts (the "Battery Pan-

---

**2.** The EPA must grant California a waiver of federal preemption unless it finds that: (1) California's determination regarding the protectiveness of its standards is arbitrary and capricious, (2) California does not need the standards "to

meet compelling and extraordinary conditions," or (3) the standards are inconsistent with § 7521(a) (setting forth EPA's authority to prescribe federal emission standards). CAA 209(b), 42 U.S.C. § 7543(b)(1) (1995).

el") to explore the readiness of electronic battery technology to meet the ZEV mandate for 1998. In its report, issued in December 1995, the Battery Panel stated that most auto manufacturers would attempt to comply with the California ZEV mandate by producing ZEVs with lead-acid batteries. *Performance and Availability of Batteries for Electric Vehicles: A Report of the Battery Technical Advisory Panel* (Dec. 11, 1995) (Plaintiffs' Exh. 12). The Battery Panel explained that lead-acid batteries imposed range and cost limitations that would severely restrict the marketability of ZEVs. According to the report, (1) a successful market for ZEVs requires the use of "advanced technology" batteries rather than lead-acid batteries, and (2) the earliest availability of ZEVs using "advanced technology" batteries would be between 2000 and 2001.

On March 29, 1996, CARB repealed the California ZEV mandate for model years 1998 through 2002. Prior to repeal, in late 1995 and early 1996, CARB held several hearings at which public comment was received. DEP followed CARB's process closely. A DEP representative attended the hearings and was in contact with CARB personnel thereafter. As amended, the California LEV regulations require no ZEVs until model year 2003, when ten percent of the vehicles delivered for sale or lease in California must be ZEVs. CARB submitted the amended standards to the EPA on February 26, 1997. According to the plaintiffs, CARB eliminated the ZEV mandate for model years 1998 through 2002 because of the limitations of both technological development and consumer acceptance. It concluded that the unavailability of "advanced technology" batteries prevented the launching of a successful market for ZEVs.

Having repealed its ZEV mandate for the years 1998 through 2002, CARB then entered into private memoranda of agreement ("MOAs") with the same seven major automakers. *See e.g.*, Memorandum of Agreement between CARB and General Motors Corp. (Aug. 13, 1996) (Plaintiffs' Exh. 20). CARB felt that electric vehicles were not ready for the marketplace as a general matter and thus, imposed no regulatory requirement for commercially available ZEVs prior to 2003, but to satisfy what market demand might be present, CARB obtained the automakers' commitment in the MOAs to meeting that demand. For the years 1998 through 2000, the MOAs required each signatory automaker to place into service in California urban areas a specified number of ZEVs. This number represented a pro rata share of the total number of ZEVs to be produced by the seven automakers collectively.

The MOAs also set forth the automakers' agreement to promote ZEVs, fund battery research, and initiate a Technology Demonstration Project in California. In addition, the MOAs contained enforcement mechanisms and penalties in the event the automakers failed to attain the production of ZEV vehicles required under the agreements. Under specified circumstances, CARB may pursue liquidated damages from the automakers, and CARB explicitly retained the right to take regulatory action including reinstatement of the percentage ZEV requirements previously repealed.

On the other hand, CARB also undertook certain obligations and incentives to demonstrate California's commitment to the program. It promised to facilitate purchases in state fleets; to work with the Department of Insurance and with banks to facilitate coverage and financing issues; to work on battery disposal and re-cycling, and to provide charging stations for the public and contractors. The MOAs were not, and will not be, submitted to the EPA for approval, CARB taking the position that the MOAs fall within the scope of the existing § 209(b) waiver. CARB, however, has requested confirmation from the EPA that its amended regulations fall within the scope of the 1993 waiver.

### C. *The Massachusetts ZEV regulations*

Massachusetts is a member of the "Northeast Ozone Transport Region" ("Northeast OTR"), an area consisting of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Virginia, Vermont, and the District of Columbia. CAA § 184; 42 U.S.C. § 7511c(a). Congress established the Northeast OTR upon a deter-

mination that the transport of ozone may require that the Northeast states' efforts to attain the ozone NAAQS be interdependent. EPA, Proposed Rulemaking on Ozone Transport Commission; Emission Vehicle Program for the Northeast Ozone Transport Region, 59 Fed.Reg. 21720, 21722 (Apr. 26, 1994). The EPA has designated the Northeast OTR an area with serious ozone problems. On October 29, 1991, the Northeast OTR states agreed to adopt the California LEV program in an effort to bring the region into conformity with the NAAQS for ozone. *Id.*

Massachusetts and New York were the first states in the Northeast OTR to adopt the California LEV program. DEP incorporated the California program into the Massachusetts motor vehicle emission regulations on January 31, 1992. 310 CMR 7.40. Massachusetts law required DEP to adopt emission standards based on the California program "unless, after a public hearing, [DEP] establishes, based on substantial evidence, that said emissions standards ... will not achieve, in the aggregate, greater motor vehicle pollution reductions than the federal standards." Mass.Gen.L. ch. 111, § 142K. The plaintiffs sued both Massachusetts and New York for their actions in 1993. *See* footnote 1; *MVMA I*, 810 F.Supp. 1331 (N.D.N.Y.1993).

DEP responded promptly to CARB's 1996 repeal of the California ZEV mandate, proposing to amend the Massachusetts ZEV mandate to incorporate into regulation those amendments and applicable elements of the memoranda of agreement between CARB and the auto manufacturers. *See* DEP, Background Document for Proposed Amendments to 310 CMR 7.40, *The Massachusetts Low Emission Vehicle Standards* (May 1996). DEP did not strictly duplicate the MOAs. Instead, DEP amended the Massachusetts regulations to reflect only the ZEV requirements set forth in the MOAs between CARB and the auto manufacturers. 310 CMR 7.40. The Massachusetts regulations, therefore, include ZEV requirements for the years 1998 through 2000 which are no longer required by the amended California LEV program, but, instead, are included in the voluntary MOAs between CARB and the automakers. 310 CMR 7.40(12). The portions of the MOAs which cite reciprocal obligations on behalf of CARB were not included in the Massachusetts amended regulations.

On December 6, 1996, the automakers reacted by filing their Third Amended Complaint, presenting issues very different from those in the complaint they filed against DEP in 1993. The basic question in 1993 was whether DEP's original adoption of the California regulations violated the identicality requirement of § 177 of the CAA. In the present complaint, the automakers seek to enjoin the enforcement of those regulations that require the production of ZEVs in the model years 1998 through 2002, asserting principally that the Massachusetts ZEV regulations are pre-empted by § 209(a) and that they are not identical to the California standards.

In its answer, DEP admits that while the California regulations do not include a mandate for sale of ZEVs for model years 1998 through 2002, California continues to require the sale of ZEVs by means of enforceable agreements with the leading automakers. Simply put, DEP argues that the form of the MOAs does not exempt them from § 209(a); that, in content, the MOAs serve a regulatory purpose and, therefore, are standards which Massachusetts was free to adopt pursuant to § 177.

### D. *The Motions*

The automakers have filed a motion for summary judgment challenging the validity of the 1996 amendments to the Massachusetts motor vehicle emission regulations. According to the automakers, the Massachusetts ZEV mandate is plainly a "standard relating to the control of emissions from new motor vehicles" within the meaning of § 209(a). They argue that § 209(a) therefore preempts the Massachusetts regulations unless they receive a § 209(b) waiver of federal preemption from the EPA.

The automakers also argue that Section 177 of the CAA limits DEP to adopting motor vehicle emission regulations that are identical to California standards which have received a waiver of federal preemption under § 209(b). The automakers contend that § 209(a) preempts the Massachusetts regula-

tions because they do not satisfy the "identicality requirement" or the "waiver requirement" of § 177.

In a cross motion for summary judgment, DEP argues: (1) the MOAs are "standards" under § 209(a); (2) the MOAs are within the scope of an existing waiver of federal preemption under § 209(b); and (3) the Massachusetts ZEV mandate is "identical" to the California ZEV mandate within the MOAs. DEP concludes that the Massachusetts regulations fall outside the preemptive scope of § 209(a) and in any event comply with § 177 of the CAA.

Before turning to the discussion, one further development should be noted. On February 10, 1997, the automakers filed a new lawsuit in New York, seeking to enjoin the New York regulations which still require the sale of zero emissions vehicles commencing in model year 1998 as violative of §§ 209 and 177 of the CAA. Specifically, New York took no action after the CARB repeal, and the issue was whether New York could continue to enforce its existing ZEV requirements, identical to those that California had abandoned. The automakers argued that the New York ZEV mandate was a "standard" relating to emission controls and, therefore, was preempted by § 209(a). The defendant argued that the New York ZEV mandate was not a "standard" subject to §§ 209(a) and 177. In *American Automobile Mfrs. Ass'n v. Cahill,* 973 F.Supp. 288 (N.D.N.Y. 1997), the court held that the New York ZEV mandate was not a standard under §§ 209 and 177, but rather, an "enforcement procedure" under the CAA. Summary judgment was entered for the defendants.

Both sides in this case responded quickly to the decision, supplementing their memoranda by brief submissions. In particular, DEP submitted that the holding that the New York ZEV mandate was not an emissions standard within the meaning of §§ 209 and 177 of the CAA was dispositive of this case. As discussed below, the New York decision does not control the disposition of the issues before this Court.

## II. *Discussion*

### A. *Preemption under § 209(a)*

As previously indicated, § 209(a) preempts "any [state] standard relating to the control of emissions from new motor vehicles or new motor vehicle engines...." CAA § 209(a); 42 U.S.C. § 7543(a). Section 209(a) also preempts any "[state] certification, inspection, or any other approval relating to the control of emissions ... as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle." *Id.*

The automakers argue that the Massachusetts regulations are subject to § 209(a) preemption because: (1) the regulations require auto manufacturers to produce a certain number of ZEVs for sale or lease in Massachusetts, which is plainly a "standard" regarding emission control under § 209(a); (2) the regulations require certification to ZEV standards as a condition precedent to sale or lease within the meaning of § 209(a); and (3) CARB and the EPA traditionally have treated ZEV mandates within the scope of § 209(a) preemption.

DEP, on the other hand, argues that § 209(a) does not apply to the Massachusetts ZEV regulations because: (1) they are not "standards" which establish quantitative levels of permissible vehicle emissions, and (2) they do not constitute "conditions precedent" to the sale, titling, or registration of new vehicles within the meaning of § 209(a). DEP also argues that this Court need not decide the issue because, even if applicable, § 209(a) does not preempt the Massachusetts ZEV regulations because they comply with each requirement set forth in § 177.

In interpreting statutes, courts must "begin with the language of a statute and ask whether Congress has spoken on the subject." *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991). If the language of the statute is clear, the court must terminate its inquiry and give effect to the unambiguous intent of Congress. *Id.; MVMA v. NYSDEC,* 810 F.Supp. 1331, 1338 (N.D.N.Y.1993). The court should consider legislative history and policy only where the contested language is

ambiguous. *Summit Investment & Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir. 1995).

As to the question of whether the Massachusetts ZEV sales regulation is a "standard" pre-empted by § 209(a), I see nothing in the language of § 209(a) that indicates that Congress intended the narrow interpretation urged by DEP. Considering the language of the pre-emption provision itself, it seems that the proper question is not whether Massachusetts' regulation constitutes a standard, but whether by enacting the regulation, Massachusetts "adopts or attempts to enforce" a "standard."

The language of the statute does not make clear whether a "standard" is strictly limited to a quantitative level of pollutants or also can encompass other types of rules relating to emissions control. As noted by the United States Court of Appeals for the District of Columbia, "[t]he legislative history ... indicates that Congress intended the word 'standards' in section 209 to mean quantitative levels of emissions ...." *See Motor & Equip. Mfrs. Ass'n v. EPA,* 627 F.2d 1095, 1112 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980) (discussing Senate Report on the Air Quality Act of 1967, S.Rep. No. 403, 90th Cong., 1st Sess. 32 (1967)). In light of this legislative history, the court specifically states that Congress used the term "standards" in § 209(a) "in obvious reference to the numerical limitations on ... pollutants." *Id.*

A Report of the Committee on Interstate and Foreign Commerce, however, states,

> Congress is therefore presented directly with the question of the extent to which the Federal standards should supersede state and local laws on emissions from motor vehicles. Rather than leave this question to the uncertainties involved in litigation, the committee has agreed ... that *State laws applicable to the control of emissions from new motor vehicles* or new motor vehicle engines are superseded.

H. Rep. No. 728, 98th Cong., 1st Sess. at 21 (1967) U.S. Code Cong. & Admin. News 1967 pp. 1967, 1956 (emphasis added). This report indicates that Congress intended to provide § 209(a) with a broad preemptive scope.

For purposes of this decision, it is not necessary to determine whether there are restrictions on the meaning of "standard" in § 209(a). The ZEV sales mandate is one of several provisions within the amended Massachusetts LEV Standards published in the Code of Massachusetts Regulations. 310 CMR 7.40. The definition of ZEVs in the Massachusetts regulations is "any passenger car or light duty truck which produces zero emissions of any criteria pollutants under any and all possible operational modes and conditions." 310 CMR 7.00. This definition by its terms adopts a standard of zero emissions for ZEVs, and falls within the plain meaning of "standard relating to the control of emissions."

■ In consideration of the plain meaning of the term "standard" and the statute as a whole, this Court finds that the Massachusetts ZEV sales mandate "adopts or attempts to enforce" a "standard" within the meaning of § 209(a). The Massachusetts ZEV sales mandate requires the seven largest auto manufacturers to "produce and deliver for sale or lease in the Commonwealth of Massachusetts a number of ZEVs equal to its pro rata share of 750 ZEVs for calendar year 1998, and pro rata share of 1500 ZEVs annually for calendar years 1999 and 2000." 310 CMR 7.40(12), (b). By requiring the automakers to produce a certain number of ZEVs in the years 1998 through 2000, Massachusetts directly "attempts to enforce" a "standard" of zero emissions for new cars for those years in violation of § 209(a). Thus, Massachusetts' ZEV sales regulation is expressly pre-empted by § 209(a) unless saved by some other part of the statutory scheme.

### B. *Compliance with § 177*

1. *Requirement of a California Standard*

a. *The Massachusetts ZEV sales mandate for 1998 through 2000 does not adopt a California "standard" in accordance with § 177.*

A state regulation relating to control of emissions from new motor vehicles or engines can survive pre-emption if, in accordance with § 177, it adopts and enforces

standards which are "identical to the California standards" for which the EPA has granted a waiver "for such model year". CAA § 177, 42 U.S.C. § 7507. But a state may not either adopt or enforce a standard which does not meet these requirements. Put another way, under § 177, a state can pass regulations only if it accepts as the basis for its regulations a California "standard" which has been granted a waiver in accordance with § 209(b).

The automakers argue that the new Massachusetts ZEV requirements for the years 1998 through 2000 violate the "identicality" requirement of § 177 because there is no California "standard" to which they are identical. The amended California emissions regulations contain no ZEV requirement until model year 2003. The automakers contend that the MOAs upon which the Massachusetts ZEV sales mandate is based are not California "standards" within the meaning of § 177, and that the Massachusetts regulations are not identical even with the MOAs. Thus, the automakers conclude that the Massachusetts regulations violate § 177 and this court should enjoin their enforcement.

DEP argues that California did have ZEV standards in place for the model years 1998 through 2000 at the time Massachusetts amended its regulations in the form of MOAs. DEP maintains that the Massachusetts ZEV regulations are strictly "identical" to the California ZEV mandate set forth in the MOAs, thus, they survive pre-emption under § 177.

■ At the time Massachusetts enacted its amendments to its ZEV sales regulations, California law did not include a ZEV standard, i.e., a standard of zero emissions, for any model year earlier than 2003. The amended Massachusetts ZEV sales mandate includes requirements for new cars with a zero emissions level in the years 1998 through 2000. These regulations do not

adopt a standard identical to California law, or enforce such a standard. Consequently, unless some other reason operates to bar the impact of §§ 209(a) and 177, the Massachusetts ZEV sales regulations are preempted.

I recognize that this conclusion in part is supported by, but in part contradicts, the recent decision in *American Automobile Manufacturers Association v. Cahill*, 973 F.Supp. 288 (N.D.N.Y.1997). There, the Court upheld a ZEV sales mandate, which New York enacted in 1992 and did not change thereafter, requiring *inter alia* that ZEV sales comprise 2% of new vehicle sales in 1998, 5% in 2000, and 10% in and after 2003. New York Low Emissions Vehicle Program, 6 N.Y.C.R.R. Part 218. The Court in *Cahill* found that the regulation fell outside the scope of § 209(a) because it was not a "standard" setting a quantitative level on emissions for ZEVs, but rather only an "enforcement procedure" requiring the production of a certain number of ZEVs. *Cahill*, 973 F.Supp. at 306–07.

■ This distinction between a quantitative emissions standard and an enforcement procedure, i.e., a regulation establishing a method of enforcing a quantitative emissions standard, may be a valid one where the standard which the enforcement procedure enforces is one within a state's power to "adopt or attempt to enforce" under § 209(a) and § 177.[3] As the Court in the New York case noted,

> [w]hile § 177 clearly sets forth that individual States may not create their own emission standards and must comply with either the Federal or California standards, ... the Act does not place this restriction on States in regards to enforcement of those emission standards.

*Id.* at 306. Enforcement procedures may differ from state to state. *Id.; MVMA V*, 79 F.3d 1298, 1305 (2d Cir.1996), *Motor and*

---

3. Indeed, at the time New York enacted its ZEV sales mandate, California required quantitative emissions levels of zero emissions for some new cars in 1998 and 2000, as well as 2003. New York's "enforcement procedure" therefore was consistent with California's zero emissions standard for model years 1998 and 2000 at the time it was enacted. By contrast with Massachusetts,

New York never amended its ZEV sales mandate after California repealed its requirements for ZEVs for model years 1998 and 2000 in March, 1996. When Massachusetts amended its regulations in 1996, neither the federal law nor California law included a requirement of zero emissions for any new vehicle in model years 1998 and 2000.

*Equip. Mfrs. Ass'n v. Environmental Protection Agency,* 627 F.2d 1095, 1112–1113 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). This means that, as to a quantitative emissions standard which survives preemption under §§ 209(a) and 177, a state may employ enforcement mechanisms different from those which California employs in order to ensure that such a standard is met. With this part of the logic of the New York decision, I agree.

I must take issue, however, with the determination that the New York ZEV sales mandate is not preempted by the Act simply because it is an "enforcement procedure" and not a "standard." I believe that it sweeps too broadly. The Court in *Cahill* reasons:

> Of course, if the ZEV mandate is an "emissions standard," it is preempted by the Act because New York's standards would have to be identical to California's standards, and California has abandoned its ZEV mandate for the model years 1998 through 2002. On the other hand, if the ZEV mandate is an "enforcement procedure," it is not preempted by the Act.

*Cahill,* 973 F.Supp. at 306. While it is true that a state's "enforcement procedure" need not be identical to California's, it does not follow that a state's "enforcement procedure" may set requirements more demanding than what a quantitative emissions "standard" authorized by the federal statutory scheme would allow. It is not consistent with congressional intent that an "enforcement procedure" could validly enforce a "standard" that would be preempted. For §§ 209(a) and 177 to make any sense, enforcement procedures relating to new motor vehicles necessarily must "attempt to enforce" a standard consistent with a federal standard or identical to a California standard as to which the EPA has granted a waiver.

Accordingly, I must reject the DEP's argument that the Massachusetts ZEV sales mandate is merely an "enforcement procedure"

not subject to preemption by §§ 209(a) and 177. Regardless of how the parties characterize it, the Massachusetts ZEV sales mandate requires in the years 1998 and 2000 what the federal law and California law do not: new cars meeting a zero emissions level. To the extent that the Massachusetts ZEV sales regulation requires production of new ZEVs in years prior to 2003, the regulation "attempts to enforce" a quantitative standard which, in 1996, Massachusetts had no power either "to adopt or attempt to enforce."[4] Because the Massachusetts ZEV sales requirements for years prior to 2003 do not adopt or enforce any federal or California standard, they cannot survive preemption unless some other exception to preemption preserves them.

b. *The Massachusetts ZEV mandate for 1998 through 2000 does not satisfy the "identicality" requirement of § 177.*

For state standards regarding emissions from new motor vehicles or engines to survive preemption, they must be *"identical* to the California standards for which a waiver has been granted for such model year." CAA § 177, 42 U.S.C. § 7507 (emphasis added). Inherent in the conclusion that there is no California "standard" which the Massachusetts ZEV sales mandate for the years 1998 through 2000 "adopts or enforces" is the determination that the Massachusetts regulation does not satisfy the "identicality" requirement of § 177.

In interpreting the statute, this Court attaches "plain meaning" to the term "identical." *See Summit Investment & Dev. Corp. v. Leroux,* 69 F.3d 608, 609 (1st Cir. 1995) (instructing courts to interpret statutes according to "plain meaning" of statutory language). As of 1996, the California regulations did not include any requirement for ZEVs for years prior to 2003; the Massachusetts ZEV sales mandate does. To the extent that the Massachusetts ZEV sales

---

4. This determination does not necessarily prevent a state from requiring compliance with a standard stricter than the federal or California standard through means other than enactment of law, such as through a voluntary agreement with the automakers. Accomplishing such stricter

compliance, of course, would require that a state had either the cooperation of the automakers or the leverage to persuade the automakers to enter into such an agreement, as California did with its MOAs.

mandate includes these provisions, it is preempted by §§ 177 and 209(a) because it is not "identical" to the California regulations.

## 2. California's MOAs

DEP urges the Court to find that the Massachusetts ZEV sales mandate survives preemption because it is based on CARB's MOAs with the auto manufacturers. DEP argues that the MOAs themselves constitute "standards" within the meaning of § 209(a). Logically, if the MOAs were standards, they would be subject to § 209(a) pre-emption unless they met the waiver requirement of § 177. DEP asserts that the MOAs fall within an existing waiver from the EPA, and lastly, that the Massachusetts regulations are identical to the MOAs. If all of these points proved to be true, it would follow that the Massachusetts regulations would escape preemption because they would "adopt or enforce" a permissible California emissions standard for new motor vehicles or engines in accordance with § 177. For the following reasons, however, I find that the MOAs are not "standards" for purposes of §§ 209(a) and 177, and thus that Massachusetts' adoption of their terms into regulations does not save its ZEV sales mandate from preemption.

### a. California's MOAs Are Not "Standards" for Purposes of § 209 Preemption.

#### i. DEP's position.

DEP contends that the contractual form of the MOAs does not prevent them from having effect as a California "standard" for purposes of § 209(a) preemption and the exception to preemption under § 177. DEP asserts that neither federal administrative law nor § 209(a) restricts § 209's preemptive reach to formally promulgated regulations. DEP also argues that regardless of the automakers' characterization of the MOAs as voluntary private agreements outside the scope of federal preemption, CARB has assumed a regulatory role with respect to the MOAs, making them "standards" within the scope of § 209(a) preemption.

According to DEP, the following factors indicate the regulatory nature of the MOAs: (1) the automakers admit that if CARB had adopted the MOAs as regulations, their content would be subject to preemption under § 209(a); (2) the MOAs have a regulatory effect since they call for ZEV production for the marketplace, rather than for CARB in particular; (3) the MOAs serve a regulatory purpose because they are designed to ensure adherence to ZEV mandates and other obligations imposed on the auto manufacturers; and (4) the MOAs contain enforcement mechanisms that invoke CARB's regulatory authority. DEP argues that CARB does not shed its regulatory role by simply "shifting" the California ZEV mandate from regulations to private state agreements.

Finally, DEP argues that it is more consistent with congressional intent to subject the MOAs to preemption under § 209(a). According to DEP, when Congress directed the EPA to ensure that California's vehicle emission standards are at least as stringent as the federal standards, it intended the California standards to be subject to EPA review. DEP concludes that if the Court allows CARB to transfer portions of the California standards into private agreements beyond the reach of § 209(a), it will prevent the EPA from fulfilling that duty. DEP therefore urges this Court to declare the MOAs "standards" which are preempted by § 209(a) unless granted a waiver of federal preemption under § 209(b).

#### ii. The automakers' position.

The automakers offer several reasons why the MOAs are not "standards" within the meaning of § 209. First, CARB did not enter the MOAs pursuant to California administrative law. Under California law, after subjecting proposed regulations to public notice and comment, state agencies must receive approval from the California Office of Administrative Law ("COAL") and file the regulations with Secretary of State. Cal. Gov't Code §§ 11340.5, 11343 et seq., 11349 et seq. CARB did not subject the MOAs to this process.

The automakers also argue that the MOAs are not "standards" or "regulations" subject to § 209(a) preemption because CARB has

repeatedly and unequivocally stated that the MOAs are not "regulatory" in nature. According to the automakers, it was for this reason that CARB did not and will not submit the MOAs to the EPA for a § 209(b) waiver of federal preemption. As noted by the automakers, CARB has stated that "there is no regulatory requirement for commercially available ZEVs until 2003" and "the MOAs are fully enforceable as contracts under state law." (Plaintiffs' Memo at 26). Further evidence of the non-regulatory nature of the MOAs, contend the automakers, is the liquidated damages clause which is enforceable under California contract law, rather than pursuant to CARB's regulatory authority.

The automakers' third argument is based on principles of federal preemption. The automakers assert that, because § 209(a) is a federal preemption provision, its scope is limited to statutes, laws, and constitutions enacted or enforced by the states. The automakers note that the Supreme Court, in interpreting the scope of a different federal preemption provision, held that contractual agreements are not subject to preemption because they "do not amount to a State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law.'" *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 229, 115 S.Ct. 817, 824, 130 L.Ed.2d 715 (1995). Characterizing the MOAs as "voluntary contractual agreements" rather than state "laws" or "regulations," the automakers conclude that the MOAs are not subject to § 209(a) preemption.

Finally, the automakers argue that the language and legislative history of § 209(a) lack any indication that Congress intended to preempt voluntary state contracts. In fact, the automakers maintain that the text and legislative history confine the scope of § 209(a) to state "standards," "regulations" and "laws." As a final note, the automakers contend that holding that the MOAs are within the preemptive scope of § 209(a) would have the absurd effect of barring all "non-California" states from agreeing to a voluntary emission program that is not identical to the California program.

### iii. *The MOAs are not California "standards".*

Resolution of this dispute depends on the text of § 209(a), a determination of congressional preemptive intent, and general rules of federal preemption. *See Summit Investment & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995) (examining plain meaning of statutory language to determine scope of federal preemption provision); *People of the State of California v. Dept. of the Navy*, 431 F.Supp. 1271, 1282 (N.D.Cal.1977) ("both the existence and the scope of preemption are determined by Congressional exclusionary intent").

As always, the inquiry begins with the language of the statute. *Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n*, 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991). Although no court has considered whether the California MOAs are "standards" under § 209(a), several authorities have defined the term "standard" in other contexts. Section 302(k) of the CAA defines the term "emission standard" as "a requirement *established by the state* ... which limits the quantity, rate, or concentration of emissions of air pollutants." CAA § 302(k), 42 U.S.C. § 7602(k) (emphasis added). Likewise, Webster's Dictionary defines "standard" as "something that is *set up and established by authority* as a rule for the measure of quantity, weight, extent, value or quality." Webster's Third New Int'l Dictionary at 2223 (1971) (emphasis added). These definitions contemplate unilateral action by the state, not a joint effort such as that which culminated in the MOAs between CARB and the auto manufacturers. Because the ZEV requirements in the MOAs were voluntarily undertaken by the auto manufacturers rather than imposed by CARB, these definitions place the MOAs outside the scope of § 209(a).

Other definitions exist, however, indicating that the term "standard" under the CAA may simply mean a quantitative limit on allowable motor vehicle emissions, whether imposed by the state or agreed to by the automakers. The United States Supreme Court defined the term "standard" under § 112 of the CAA as a "quantitative 'level' to

be attained by use of 'techniques,' 'controls,' and 'technology.' *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 286, 98 S.Ct. 566, 572, 54 L.Ed.2d 538 (1978). The Court of Appeals for the District of Columbia Circuit adopted this definition in *Motor & Equip. Mfrs. Ass'n v. Environmental Protection Agency,* 627 F.2d 1095 (D.C.Cir.1979), *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). Furthermore, in addition to defining "standard" as set forth above, Webster's Dictionary states that "standard" may also mean "something that is established by authority, custom *or general consent* as a model or example to be followed." Webster's Third New Int'l Dictionary at 2223 (1971) (emphasis added). These definitions support DEP's argument that the term "standard" is not necessarily restricted to formal regulations.

▆▆▆▆ Although these definitions of the term "standard" are helpful, this Court must look beyond them. As stated by the Court of Appeals for the First Circuit,

> [i]nstead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language.

*O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996). Courts must construe the statute "so that no provision will be inoperative or superfluous." *Motor & Equip. Mfrs. Ass'n,* 627 F.2d at 1108, *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). Where explicit pre-emption language in a federal statute "does not directly answer the question" whether certain state action is preempted, "courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language nonetheless reveal a clear, but implicit, pre-emptive intent." *Philip Morris Incorporated, v. L. Scott Harshbarger,* 122 F.3d 58, 66–67 (1st Cir.1997), *quoting Barnett Bank v. Nelson,* 517 U.S. 25, 31–32, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237 (1996). In doing so, "[i]f the

intent of Congress is clear, that is the end of the matter; for the court … must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Sections 209(a) and 209(b)(1) both refer to states' inability to "adopt" or "attempt to enforce" standards relating to motor vehicle emissions. The plain meaning of these terms indicates that Congress intended § 209 to apply to state regulations "adopted" into state regulatory codes, rather than to agreements such as the MOAs, which were jointly executed instead of unilaterally "adopted." In addition, it is unlikely that Congress intended the term "standards" to have a different meaning when referring to state standards as compared to federal standards. There is no question that the "federal standards" referred to in §§ 209 and 177 are the motor vehicle emission standards which appear in the CAA, duly promulgated by Congress in accordance with traditional regulatory procedures. A "practical, commonsense reading" of the statute requires this Court to interpret the term "standards" consistently. *See O'Connell,* 79 F.3d at 176. Accordingly, the state "standards" referred to in § 209 are the motor vehicle emission standards prescribed by CARB by regulation.

A broader inspection of the text of § 209 supports this finding. Section 209(e)(2)(A) refers to the EPA's need to "authorize" California to adopt and enforce vehicle emission standards. CAA § 209(e)(2)(A), 42 U.S.C. § 7543(e)(2)(A). Consistent with this interpretation, the Second Circuit Court of Appeals has held that the California "standards" to which § 177 of the CAA refers are those standards that California included in its application to the EPA for a waiver of federal preemption under § 209(b). *MVMA III,* 17 F.3d at 532. Under this definition, the MOAs fall outside the scope of § 209(a) preemption because CARB did not include the MOAs in its waiver application to the EPA.[5]

---

5. The New York Court did not address the MOA's except to note that California abandoned its ZEV mandate for the years 1998 to 2002 and replaced

the sales mandate with MOA's, describing them as "binding agreements with the manufacturers

CARB did not enter into the MOAs pursuant to any authority granted by the EPA. Instead, CARB entered into the MOAs pursuant to its private power to contract, limiting itself to the benefits and detriments of private contract law. CARB may not alter or vary the terms of the MOAs, for example, "unless the modification is in writing and signed by the Parties." Memorandum of Agreement between CARB and General Motors Corp. at 10 (Aug. 13, 1996) (Plaintiffs' Exh. 20). By contrast, although it must follow administrative procedural requirements, CARB may unilaterally amend its LEV regulations upon a finding that the regulations are at least as stringent as the federal standards.

An examination of the legislative history also indicates that Congress did not intend the term "standards" to include voluntary contracts such as the MOAs. Legislative reports show that Congress has limited its discussion of § 209 preemption to state "laws," "standards," and "regulations." *See, e.g.,* H.R.Rep. No. 899, 89th Cong., 1st Sess. 5 (1965) U.S. Code Cong. & Admin. News pp. 3608, 3612; H.R.Rep. No. 728, 90th Cong., 1st Sess 21 (1967) (referring to § 209(a) preemption of "State laws"); H.R.Rep. No. 294, 95th Cong., 1st Sess. 309 (1977) U.S. Code Cong. & Admin. News pp. 1077, 1388 (discussing preemption of "State Law"). One such report also indicates that Congress was once concerned that § 209(a) interfered with the legitimate police powers of the states. H.R.Rep. No. 294, 95th Cong., 1st Sess. 309 (1977). In addition, when referring to the state standards, laws, and regulations subject to § 209(a) preemption, Congress repeatedly referred to their "enactment," "adoption," and "administration." *See, e.g.,* H.R.Rep. No. 728, 90th Cong., 1st Sess 22 (1967) (referring to states "administering" emission standards); *Air Pollution—1967 (Automotive Air Pollution): Hearings before the Subcomm. on Air & Water Pollution of the Senate Comm. on Public Works,* 90th Cong., 1st Sess. 107 (1967) (referring to the "enactment" and "adoption" of differing state standards); H.R.Rep. No. 294, 95th Cong., 1st Sess. 310 (1977) (stating states may not "adopt" standards other than California standards). Because voluntary state contracts (1) do not constitute "laws" or "regulations," (2) do not require the exercise of state police powers, and (3) are jointly executed rather than "enacted" or "adopted," the legislative history of § 209(a) indicates that Congress did not intend § 209(a) to reach such agreements as the MOAs.

The purpose of § 209(b) also supports a finding that the MOAs are outside the scope of federal preemption under § 209(a). *See California v. Dept. of the Navy,* 624 F.2d 885, 888 (9th Cir.1980) (determining scope of preemption under § 233 of CAA by examining text and purpose of § 233); *cf. Rice v. Santa Fe Elevator Corp.* 331 U.S. 218, 230–31, 67 S.Ct. 1146, 1152–53, 91 L.Ed. 1447 (1947) (instructing courts to consider purpose of statute to determine congressional preemptive intent). When Congress excepted California from federal preemption under § 209(b), it "intend[ed] to provide California with the broadest possible discretion in selecting the best means for protecting the public health and welfare." *Motor Equip. Mfrs. Ass'n,* 627 F.2d at 1112 n. 35, *cert. denied,* 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). The legislative history of § 209(b) indicates that Congress also intended California to be "the testing area" for standards more strict than those required by the federal government. S.Rep.No. 403, 90th Cong., 1st Sess. 33 (1967). Holding the MOAs outside the scope of § 209(a) preemption furthers these intentions.

Furthermore, despite DEP's arguments, placing the California MOAs beyond the reach of § 209(a) does not undermine congressional intent with respect to EPA's role under the CAA. Section 209(b) directs the EPA to grant the California motor vehicle emission standards a waiver of federal preemption only upon a determination that the California standards are "at least as protective of public health and welfare as applicable Federal standards." CAA § 209(b), 42 U.S.C. § 7542(b)(1). In enacting this provision, Congress simply directed the EPA to ensure that the California standards meet this requirement. Holding the MOAs out-

which fall outside of the realm of the Act...."    *AAMA v. Cahill,* No. 97–cv–444, slip op. at 13.

side § 209(a)'s preemptive reach does not prevent the EPA from determining whether the amended California standards published in the California Code of Regulations qualify for a waiver of federal preemption under § 209(b).

Case law interpreting other provisions of federal preemption supports this Court's conclusion. As persuasively argued by the automakers, courts generally restrict federal preemption to state laws, statutes, rules, regulations, and other state provisions having the force and effect of law. *See, e.g., Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts,* 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (refusing to preempt state enforcement of private agreement because "preemption doctrines apply only to state regulation"); *Wisconsin Dep't of Industry v. Gould,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986) (preempting state statute); *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (holding article of state constitution preempted by United States Constitution). More importantly, in construing the scope of other federal preemption provisions, several courts have made a clear distinction between state-imposed requirements and voluntary contractual agreements, restricting preemption to requirements imposed by the state. *Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts,* 507 U.S. 218, 227, 113 S.Ct. 1190, 1196, 122 L.Ed.2d 565 (1993); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 526, 526 n. 24, 112 S.Ct. 2608, 2622, 2622 n. 24, 120 L.Ed.2d 407 (1992); *Duvall v. Bristol–Myers–Squibb Co.,* 65 F.3d 392, 401, 401 n. 9 (1995).

For all of the foregoing reasons, this Court concludes that the California MOAs are not "standards" under § 209 of the CAA. Having decided that the MOAs are not "standards," this Court need not reach the question of whether, in accordance with § 177, the Mas-

sachusetts ZEV sales mandate for the years prior to 2003 are "identical" to the MOAs with respect to those years.

b. *"Waiver Requirement"*

Compliance with § 177 requires a state to adopt standards identical to "California standards *for which a waiver has been granted for such model year.*" CAA § 177, 42 U.S.C. § 7507 (emphasis added). Having determined that the MOAs upon which the Massachusetts ZEV sales mandate are based are not California "standards," it is also unnecessary to proceed to the question whether the MOAs have been granted a waiver by the EPA. For purposes of completeness, however, the Court addresses the issue briefly.

The automakers argue that the Massachusetts regulations do not meet the "waiver requirement" because they are based on MOAs which have not received a § 209(b) waiver from the EPA, and which CARB has no intention of even submitting to the EPA for review as CARB has concluded that they are not "standards." [6]

DEP argues that the MOAs fall within the scope of the § 209(b) waiver granted to CARB in 1993. As noted by DEP, the EPA has stated that once CARB receives a waiver, it may amend the waived standards without the need to obtain a new waiver as long as the amendments:

> do not undermine California's determination that its standards, in the aggregate, are at least as protective as Federal standards ... [and] do not cause any inconsistency with section 202(a) of the Act and raise no new issues regarding previous waivers.

EPA, California State Motor Vehicle Pollution Control Standards; Amendments Within the Scope of Previous Waivers of Federal Preemption; Summary of Determination, 53 Fed.Reg. 36115, 36116 (Sept. 16, 1988). DEP argues that the California regulations,

---

**6.** On September 18, 1997, DEP filed a brief submission with the Court regarding a recent argument advocated by the automakers to the Court of Appeals for the Second Circuit. The argument bears on the question of whether CARB must expressly request or obtain a determination by the EPA that its current ZEV mandate embodied

in the MOAs falls within the scope of the EPA's previous waiver under § 209. The automakers countered with their own submission on the same issue on September 30, 1997. This Court need not address the issue, as it concludes that the MOAs are not a "standard" requiring a waiver under § 209(a).

as amended by the MOAs, fall within the reach of the 1993 waiver because: (1) the ZEV mandate was not a significant factor in the EPA's 1993 determination that the California regulations were at least as protective of public health and welfare as the federal standards; (2) the EPA found the original California ZEV mandate consistent with technology, so any relaxation of that mandate renders compliance with § 202(a) only easier; and (3) CARB reported in its Scope of Waiver Letter that the amendments do not raise new issues regarding the 1993 waiver. Asserting that CARB does not require formal EPA confirmation that its amended regulations fall within the scope of a previous § 209(b) waiver, DEP concludes that the MOAs fall within the reach of the 1993 waiver.

Had it been necessary to reach the question whether the MOAs fall within the scope of the 1993 waiver in order to determine whether the Massachusetts ZEV mandate is preempted, I would have referred the question to the EPA under the doctrine of primary jurisdiction. The Court of Appeals for the First Circuit has described the doctrine of primary jurisdiction as follows:

> Broadly speaking, the doctrine, informed by principles of deference to agency decisionmaking, gives effect to the eminently sensible notion that *in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion,* agencies created by Congress for regulating the subject matter should not be passed over.... The doctrine is intended to serve as a means of coordinating administrative and judicial machinery, and to promote uniformity and take advantage of agencies' special expertise.

*Commonwealth of Massachusetts v. Blackstone Valley Electric Co.,* 67 F.3d 981, 992 (1st Cir.1995) (citations omitted) (emphasis added).

Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), the First Circuit has set forth three factors to assist courts in making

this determination. *Blackstone Valley,* 67 F.3d at 992. According to this framework, courts should consider:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Id.; see also Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 579 (1st Cir.) (setting forth three-prong test for primary jurisdiction), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90(1979).

As DEP argues, determining the scope of § 209(b) waivers lies at the heart of the responsibilities Congress assigned to the EPA under the CAA. Congress specifically delegated to the EPA the task of determining whether California's emission standards qualify for a waiver of federal preemption under § 209(b). CAA § 209(b), 42 U.S.C. § 7543(b). In addition to providing new waivers of federal preemption, the EPA determines whether amendments to the California standards fall within the scope of a previous waiver and whether certain action by CARB even requires a § 209(b) waiver of federal preemption. *See* EPA, California State Motor Vehicle Pollution Control Standards; Amendments Within the Scope of Previous Waivers of Federal Preemption; Summary of Determination, 53 Fed.Reg. 36115 (Sept. 16, 1988) (determining whether amendments to California's 1981 emission standards fall within scope of previous waivers); EPA, California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption; Notice of Determination, 55 Fed.Reg. 28824 (July 13, 1990) (deciding whether California requires § 209(b) waiver before it can enforce certain pollution control regulations). In addition, had this Court found that the MOAs were California "standards" for purposes of overcoming preemption pursuant to § 177, an EPA determination on whether the MOAs fall within scope of the 1993 waiver indisputably would have "materially aid[ed]" this Court in the resolution of this case.

### III. Conclusion

One final note is in order. On April 9, 1993, the plaintiffs filed this lawsuit, challenging the California-style motor vehicle emissions standards that were adopted by DEP on the grounds that the standards were inconsistent with, and expressly preempted by the Clean Air Act. They were unsuccessful in their motion for preliminary injunctive relief, both here in Massachusetts and partially in New York. (*See* fn. 1). Before my order issued on October 27, 1993, and since, the parties were urged to negotiate an agreement to bring cleaner air and cleaner cars to the nation, an objective both sides embraced. Indeed, the record shows that in the fall of 1993 the automakers and most northeast states, including Massachusetts, began to negotiate a voluntary agreement which would require the supply of low emission vehicles to every state but California as an alternative to adopting California's standards. The EPA supports this effort, stating its belief that "this [national LEV program] is a cleaner, smarter, cheaper pollution control for new motor vehicles." 60 Fed.Reg. 52734–5 (October 10, 1995). Now, more than four years after this case was filed, the parties have returned once more to the nation's courts in their quest to reduce air pollution by controlling emissions for gasoline powered engines.

This time, DEP fastens on what it considers California's abandonment of its leadership role and "pioneering efforts" in motor vehicle emission regulations. Perhaps there is some basis to believe CARB did use its unique position under CAA to achieve a result not intended by Congress and denied to the other states. If so, then Congress should address the issue. But it is also possible that CARB is using its unique position to achieve results which, in the long run, inures to the benefit of the entire nation and, in so doing, fulfilling the purpose of Congress in giving a special position to California in this field.

For the reasons set forth above, Plaintiffs' motion for summary judgment is GRANTED and Defendant's cross-motion for summary judgment is DENIED.

SO ORDERED.

### JUDGMENT ON COUNTS ONE, TWO AND FOUR

This matter came on for hearing before the Court (Mazzone, D.J.) on the parties' cross-motions for summary judgment, whereupon, upon consideration of the arguments and exhibits of the parties, and finding that there is no just reason for delay,

It is ADJUDGED and DECLARED, in accordance with the Court's Memorandum and Order on Plaintiff's Motion for Summary Judgment and Defendant's Cross–Motion for Summary Judgment dated October 15, 1997,

That judgment be entered in favor of Plaintiff as to Counts One, Two and Four of the Third Amended Complaint as follows:

That the Defendant's regulations published at 310 CMR 7.40(12), mandating that certain automobile manufacturers produce and deliver zero emissions vehicles ("ZEVs") for sale in Massachusetts in calendar years prior to 2003 and that they file periodic reports in those years regarding actual and projected delivery and production of ZEVs, are preempted by Clean Air Act §§ 209(a) and 177 as the regulations do not adopt or enforce, and are not identical to, a California standard in effect for that period.

SO ORDERED.

