ENGINE MANUFACTURERS
ASSOCIATION, Plaintiff,

v.

SOUTH COAST AIR QUALITY MAN-
AGEMENT DISTRICT ("SCAQMD"),
et al., Defendants.

Natural Resources Defense Council, Co-
alition for Clean Air, Inc., Communi-
ties for A Better Environment, Inc.,
Planning and Conservation League,
and Sierra Club, Intervenors.

Western States Petroleum Association,
Intervenor.

No. CV 00–09065FMC(BQRx).

United States District Court,
C.D. California.

Aug. 22, 2001.

Ward L. Benshoof, Ann M. Martorano, Weston Benshoof Rochefort, Rubalcava & MacCuish, Los Angeles, CA, Jed R. Mandel, Timothy A. French, Neal Gerber & Eisenberg, Chicago, IL, for Engine Manufacturers Association.

Teresa A. Beaudet, Jerome M. Jauffret, Gregory R. McClintock, Mayer Brown & Platt, Los Angeles, CA, for Western States Petroleum Association.

Fran M. Layton, Shute Mihaly & Weinberger, San Francisco, CA, Barbara B Baird, Kurt R Wiese, South Coast Air Quality, Management District, Diamond Bar, Daniel P. Selmi, Daniel P. Selmi Law Offices, Los Angeles, CA, for South Coast Air Quality Management District, "SCAQMD", William A. Burke, SCAQMD Board Chairman, Norma J. Glover, SCAQMD Vice–Chairman, Michael D. Antonovich, SCAQMD Board Member, Hal Bernson, SCAQMD Board Member, Jane W Carney, SCAQMD Board Member, Cynthia P. Coad, SCAQMD Board Member, Beatrice J. S. Lapistokirtley, SCAQMD Board Member, Ronald O. Loveridge, SCAQMD Board Member, Jon D. Mikels, SCAQMD Board Member, Leonard Paulitz, SCAQMD Board Member, Cynthia Verdugo–Peralta, SCAQMD Board Member, S. Roy Wilson, SCAQMD Board Member, Barry R Wallerstein, SCAQMD Executive Officer.

Gail Ruderman Feuer, Julie Masters, Natural Resources Defense Council, Los Angeles, CA, for Natural Resources Defense Council, Inc., Coalition for Clean Air Inc, Communities for a Better Environment, Inc., Planning and Conservation League, Sierra Club.

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

COOPER, District Judge.

### I. Background

A. *The Parties*

Plaintiff Engine Manufacturers Association ("EMA") is the not-for-profit trade association representing the leading manufacturers of internal combustion engines used in most all medium-duty and heavy-duty motor vehicles, other than passenger cars. EMA members manufacture the medium-duty and heavy-duty compression-ignition, diesel-fueled engines that are installed in certain pickup trucks and sports-utility vehicles, delivery vans, shuttle vans, and cargo vehicles, trucks, tractor-trailers, waste haulers, street-sweepers and buses, and sold throughout the United States.

Plaintiff–in–Intervention Western States Petroleum Association ("WSPA") is a trade association organized as a nonprofit corporation under California law. Its members consist of companies engaged in the exploration, production, transportation, refining and marketing of crude oil and petroleum products, including diesel fuel.

Defendant South Coast Air Quality Management District ("SCAQMD") is the

air quality management district established under the California Health and Safety Code to develop and implement a strategy for achieving and maintaining ambient air quality standards within the South Coast Air Basin. Agents of the SCAMQD, including the SCAMQD Defendants,[1] are responsible for administering the Fleet Rules at issue.

Defendants–in–Intervention "Environmental Intervenors" are non-profit organizations[2] dedicated to the protection of the environment and public health.

California Attorney General Bill Lockyer submitted an *amicus curiae* brief on behalf of the State of California in support of the SCAQMD's motion for summary judgment and in opposition to the cross-motions for summary judgment filed by EMA and WSPA.

### B. *The South Coast Air Basin*

The South Coast Air Basin ("the Basin"), which includes Los Angeles, San Bernardino, Riverside, and Orange Counties, experiences the most serious air quality problems in the nation, primarily due to motor vehicle pollution. (Staff Report ("SR") 1191–1, p. 7439) It is the only air basin in the country classified by the United States Environmental Protection Agency ("E.P.A.") as an extreme nonattainment area. *See* 42 U.S.C. § 7511(a). On-road motor vehicles contribute more than one-half of the ozone precursors emitted in the Basin and are a principal source of toxic pollution. (Administrative Record ("AR") 57 R–6252)

Emission of particulate matter from diesel vehicles and equipment is the most significant individual toxic air pollutant in the Basin, accounting for fully seventy-one percent (71%) of the air-borne cancer risk. (AR 57 R–6258) The California Air Resources Board ("CARB") has formally designated particulate emissions from diesel-fueled vehicles as a Toxic Air Contaminant. Studies reveal that exposure to diesel exhaust increases the risk of developing lung cancer and other non-cancer adverse health effects. (AR 41 R–1840) Diesel exhaust has also long been considered a probable human carcinogen by the National Institute of Occupational Safety and Health and by the International Agency for Research on Cancer. (AR 41 R–1841)

Diesel trucks and buses are also significant contributors to smog and fine particles, two pollutants that have serious public health impacts. On-road motor vehicles contribute more than half of all smog-forming hydrocarbons and oxides of nitrogen in the entire emissions inventory. (SR 1191–1, p. 7439). More than ninety-percent (90%) of the particles emitted from diesel engines are fine particles. (AR 54 R–5514–5515) Fine particles are particularly hazardous because they can bypass respiratory defense mechanisms and penetrate deeply into the lungs. (AR 20 R–5783) The presence of high quantities of fine particles in the air has been shown to lead to higher mortality rates, greater occurrences and severity of asthma, cardiovascular disease, and potentially to a higher incidence of cancer. (AR 39 R–1325)

### C. *Legislative Background*

#### 1. *The Clean Air Act*

The Clean Air Act, 42 U.S.C. §§ 7401–7671q ("CAA"), "is one of the most comprehensive pieces of legislation in our na-

---

1. The "SCAQMD Defendants" consist of thirteen (13) Board members of the SCAQMD, including the SCAQMD's Executive Director.

2. The non-profit organizations include: Coalition for Clean Air, Inc.; Natural Resources Defense Council, Inc.; Communities for a Better Environment, Inc.; Planning and Conservation League; and Sierra Club.

tion's history." *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 524 (2d Cir.1994). The CAA makes "the States and the Federal Government partners in the struggle against air pollution." *General Motors Corp. v. U.S.,* 496 U.S. 530, 532, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990). A primary purpose of the CAA is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of this chapter, for pollution prevention." 42 U.S.C. § 7401(c). Additionally, Congress envisioned the CAA as a means of encouraging and assisting "the development and operation of regional air pollution prevention and control programs." 42 U.S.C. § 7401(b)(4).

The CAA directs the E.P.A. to establish and enforce national ambient air quality standards ("NAAQS") for pollutants that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a). To achieve and maintain these NAAQS by regulating sources of air pollution, each state is required to submit a state implementation plan ("SIP") to the EPA for approval. CAA § 110, 42 U.S.C. § 7410(a)(1). However, states may not promulgate individual motor vehicle emission standards to attain the NAAQS set by the EPA. Section 209(a) expressly preempts all state regulation of motor vehicle emissions. Congress preempted the field of vehicle emission regulation for two reasons: "to ensure uniformity throughout the nation, and to avoid the undue burden on motor vehicle manufacturers which would result from different state standards." *Motor Vehicle Mfrs. Ass'n v. New York State Dep't. of Envtl. Conservation,* 810 F.Supp. 1331, 1337 (N.D.N.Y.1993), *aff'd in part, rev'd in part,* 17 F.3d 521 (2d Cir.1994).

"Both the history and text of the [CAA] show that the ... preemption section was made not to hamstring localities in their fight against air pollution but to prevent the burden on interstate commerce which would result if, instead of uniform standards, every state and locality were left free to impose different standards for exhaust emission control devices for the manufacture and sale of new cars."

*Allway Taxi, Inc. v. City of New York,* 340 F.Supp. 1120, 1124 (S.D.N.Y.1972).

2. *Preemption*

■ The United States Supreme Court has given substantial weight in the preemption analysis to evidence that Congress intended to preserve the state regulatory authority, stating that courts must "give full effect to evidence that Congress considered, and sought to preserve, the States' coordinate regulatory role in our federal scheme." *California v. Fed. Energy Regulatory Comm'n,* 495 U.S. 490, 497, 110 S.Ct. 2024, 109 L.Ed.2d 474 (1990). Moreover, the Supreme Court has cautioned that preemption provisions must be narrowly and strictly construed. *See Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986); *see also Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1265 (9th Cir.1998); *Chrysler Corp. v. Tofany,* 419 F.2d 499, 511 (2d Cir.1969) (where exercise of local police power serves the purpose of a federal Act, the preemptive effect of that Act should be narrowly construed).

The Clean Air Act explicitly protects the authority of states to regulate air pollution. The first section of the CAA, entitled "Congressional Findings", 42 U.S.C. § 7401, makes clear that the states retain the leading authority in regulating matters of health and air quality: "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at

its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Similarly, 42 U.S.C. § 7407, which focuses on SIPs, provides: "Each state shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State." 42 U.S.C. § 7407(a).

■ "In preemption analysis, the Supreme Court is highly deferential to state law in areas traditionally regulated by the states." *Exxon Mobil Corp. v. U.S. E.P.A.*, 217 F.3d 1246, 1255 (9th Cir.2000). The Court has explained:

> [W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law ... [I]n cases like this one, where federal law is said to bar state action in fields of traditional state regulation ... we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654–55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (internal citations omitted). "Air pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state. Environmental regulation has traditionally been a matter of state authority." *Exxon Mobil Corp.*, 217 F.3d at 1255; *see also Massachusetts v. U.S. Dep't of Transp.*, 93 F.3d 890, 894 (D.C.Cir.1996). The Supreme Court has directed that the preemption analysis begin with the presumption that such local police powers are not preempted: "Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, ... matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal citations omitted). The CAA "explicitly preserved this principle: 'Each state shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State.'" *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

■ Furthermore, the Supreme Court has made clear that the objectives and purpose of a statute, as well as the text, are critical to the preemption analysis. *See Travelers*, 514 U.S. at 654, 115 S.Ct. 1671; *Medtronic*, 518 U.S. at 486, 116 S.Ct. 2240. "The overriding purpose of the Clean Air Act is to force states to do their job in regulating air pollution effectively so as to achieve baseline air quality standards, the NAAQS. The primary mechanism for achieving the NAAQS are through the local and state planning process which create the SIPs." *Exxon Mobil Corp.*, 217 F.3d at 1255–56. "As regulating air pollution falls under the historic police powers of the states, the authority of the states is assumed not to have been preempted unless it was the clear and manifest purpose of Congress to do so." *Id.* at 1256; *see also Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be super-

seded by the Federal Act unless that was the clear and manifest purpose of Congress.").

### 3. *Legislative History of the Clean Air Act*

The original CAA, enacted by Congress in 1955, was aimed primarily at increasing federal research and assistance in air pollution prevention. It made no provision for federal motor vehicle emission standards. After several states adopted their own motor vehicle emission standards, the Senate Committee on Public Works decided that national standards were to be preferred over having each state go its own way, "which could result in chaos insofar as manufacturers, dealers, and users are concerned." S.Rep. No. 192, 89th Cong., 1st Sess. 5–6 (1965). As a result, Congress enacted emission standards for new motor vehicle engines.

Despite this enactment, a number of states continued to develop separate emission programs. Congress promptly amended the CAA in 1967 to impose federal preemption over motor vehicle emission standards. *See* Air Quality Act of 1967, Pub.L. No. 90–148, § 208, 81 Stat. 485. An exception, however, was made for California because of its "unique problems" and its "pioneering efforts" to control its particularly severe air quality problems. *Id.* at § 208(b); S.Rep. No. 403, 90th Cong., 1st Sess. (1967). In 1970, the Act was amended to establish national ambient air quality standards ("NAAQS"), which required even more stringent uniform emission standards for new motor vehicles. *See* Clean Air Amendments of 1970, Pub.L. No. 91–604, §§ 4, 6, 84 Stat. 1676.

In 1990, the Clean Air Act was amended once again. Title I of the Act directs the E.P.A. Administrator to develop NAAQS for pollutants the Administrator determines "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7408(a)(1)(A). The states are vested with the primary responsibility for attaining and maintaining the NAAQS through the development and implementation of a state implementation plan ("SIP"). *See* CAA § 110, 42 U.S.C. § 7410. Each state's SIP, which is submitted to the E.P.A., must explain exactly how the state intends to reduce or maintain the concentration of pollution in the air to meet the NAAQS. "The states have broad license to institute their own programs for the reduction of air pollution...." *Motor Vehicle Mfrs. Ass'n,* 17 F.3d at 525.

Title II of the Act reflects Congress' endeavor to resolve the problems caused by moveable sources or vehicle emissions. The emission standards applicable to any given vehicle depend upon its weight and use classification, and its model year designation. *See* CAA §§ 202, 207(c), 42 U.S.C. §§ 7521, 7541(c). Section 202 authorizes the E.P.A. Administrator to promulgate emission standards for motor vehicles sold in the United States. Motor vehicle emission standards primarily regulate emissions of carbon monoxide (CO), hydrocarbons or volatile organic compounds (VOCs) and nitrogen oxides (NO subx).

The "cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions." *Motor Vehicle Mfrs. Ass'n,* 17 F.3d at 526; *see* CAA § 209(a), 42 U.S.C. § 7543(a); *see also Engine Mfrs. Ass'n v. U.S. Envtl. Prot. Agency,* 88 F.3d 1075, 1079 (D.C.Cir. 1996). The majority of states have chosen to rely on the federal emission standards set forth in § 202 of the CAA, 42 U.S.C. § 7521. Only California enjoys a statutory exemption allowing it to promulgate its own emission standards. *See* CAA § 209(b), 42 U.S.C. § 7543(b)(1). California may only adopt and enforce its own emission standards, however, after apply-

ing to and obtaining the approval of the E.P.A. for a waiver of preemption. *See* CAA § 209(b), 42 U.S.C. 7543. The California Air Resources Board ("CARB") submits an application upon determining that its proposed standards "will be, in the aggregate, at least as protective of public health and welfare as the applicable Federal standards." *Id.* Were California simply to change its standards, and such change were found to be within the scope of an existing waiver, California need not submit a new waiver application. *Id.*

Additionally, other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards, or, in other words, to "piggyback" onto California's preemption exception. This opt-in authority, set forth in CAA § 177, 42 U.S.C. § 7507, is carefully drafted to avoid placing "an undue burden on the automobile manufacturing industry." *Motor Vehicle Mfrs. Ass'n*, 17 F.3d at 527. Specifically: (1) an opt-in state must adopt standards identical to California's; (2) California must receive a waiver from the E.P.A. for the standards; and (3) both California and the opt-in state must adopt the standards at least two years before the beginning of the automobile model year to which they apply. *See* CAA § 177, 42 U.S.C. § 7507.

The 1990 Amendments to the CAA added two further restrictions to § 177. First, Congress added language providing that § 177 shall not be construed as authorizing an opt-in state to limit the sale of California-certified vehicles. Second, it forbade opt-in states from taking any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called "third vehicle."

### 4. *California's Plan*

Pursuant to its authority to adopt separate emission control requirements for new motor vehicle engines, California, acting through CARB, has enacted two stringent emission control programs for motor vehicles: one for light and medium-duty motor vehicles, including certain diesel-fueled vehicles (the "LEV Program"), and one for heavy-duty urban transit buses (the "Urban Bus Program").

### a. *The LEV Program*

In adopting the LEV Program in 1990–1991, CARB established the most stringent exhaust regulations ever for light and medium-duty vehicles. The regulations include three primary elements: (1) four tiers of exhaust emission standards for increasingly stringent categories of low-emission vehicles; (2) a mechanism requiring manufacturers to phase in a progressively cleaner mix of vehicles from year to year; and (3) a requirement that a specified percentage of passenger cars and lighter light-duty trucks be zero-emission vehicles ("ZEVs"). (SR 1191–4, p. 7442)

The four tiers of exhaust emission standards, in descending order of emission levels are: (1)Transitional Low–Emission Vehicles ("TLEVs"); (2) Low–Emission Vehicles ("LEVs"); (3) Ultra–Low–Emission Vehicles ("ULEVs"); and (4) Zero–Emission Vehicles ("ZEVs"). For each category a set of more stringent emission standards for carbon monoxide, nitrogen oxides and formaldehyde applies. The LEV Program achieves emission reductions by requiring manufacturers to sell progressively cleaner mixes of vehicles over time. The average emissions from the mix of these categories of vehicles produced by a given manufacturer in a given year must meet an overall "fleet average" requirement. Automobile manufacturers, under CARB's regulations, have the flexibility to decide how many vehicles of each type they manufacture and sell in order to meet the fleet average. Additional flexibility is provided through the

establishment of a marketable credit system: manufacturers may earn credits if they sell more LEVs than needed to meet the fleet average.

### b. *The Urban Bus Program*

On February 24, 2000, CARB adopted its Urban Bus Program ("UBP") to further reduce air pollution from large urban transit buses. The UBP requires: (i) reductions in particulate matter ("PM") and oxides of nitrogen ("NOx") fleet emissions by urban transit bus operators; and (ii) stringent exhaust emission standards applicable to engine manufacturers. To implement the CARB regulation, urban transit bus fleet operators are required to choose between two different compliance paths: (i) a diesel path or (ii) an alternative fuel path. Fleet operators were required to notify CARB of their choice by January 31, 2001.

Fleet operators choosing the diesel path may continue to purchase diesel powered buses as long as they comply with emission standards. These emission requirements specify that engines meet an eighty-percent (80%) PM emission reduction by October 2002. For the 2004 model year, CARB established an optional NOx emission standard representing an eighty-seven percent (87%) emission decrease relative to the current NOx standard. For the 2007 model year, diesel transit bus engines must comply with a NOx emission standard that would result in a ninety-five percent (95%) emission decreases relative to the current NOx standard. Transit agencies on the diesel path with more than 200 urban buses in their active fleet (on January 31, 2001) must place into service at least three zero-emission buses ("ZEBs") by July 1, 2003, and operate them for a year as a required demonstration project. From model year 2008 through model year 2015, a minimum fifteen percent (15%) of all new bus purchases or leases must be ZEBs for the transit agencies on the diesel path. (SR 1192–4, p. 7545) ZEBs must be certified by CARB and are expected to be powered by fuel cells, electricity, or other fuels that result in zero-emission exhaust levels. (SR 1192–5, p. 7546)

The Alternative–Fuel Path requires at least eighty-five percent (85%) of new bus purchases to be alternative-fueled. Alternative fuels are defined as compressed natural gas, liquefied natural gas, liquefied petroleum gas, methanol, electricity, fuel cells, or other advanced technologies that do not rely on diesel fuel. (SR 1192–6, p. 7547; SR 1192–2, p. 7543) Transit operators would need to introduce ZEBs into their fleets by 2010. Additionally, retrofit requirements to reduce PM emissions from existing buses are required under both paths.

### D. *The Fleet Rules*

In response to the need for the South Coast Basin to reduce pollution levels dramatically to achieve its NAAQS, the California state legislature in 1987 adopted Health and Safety Code § 40447.5, which authorizes the SCAQMD to adopt fleet rules in an effort to reduce public exposure to motor vehicle pollution. On June 16, 2000, August 18, 2000, and October 20, 2000, the SCAQMD adopted six rules (referred to hereinafter as the "Fleet Rules"), each of which mandates that when certain local operators of fleets purchase or replace their fleet vehicles, they must acquire only those specific motor vehicles that the SCAQMD has designated as meeting its standards and requirements.

### 1. *Fleet Rule 1191*

Rule 1191 requires passenger car, light-duty truck, or medium-duty vehicle public fleet operators to acquire low-emitting gasoline or alternative-fueled vehicles [3] when

---

**3.** "Alternative-fueled vehicle" is defined un-     der the Rule as "a vehicle or engine that is

procuring or leasing these vehicles in the District. The Rule applies to all government agencies and any special districts with 15 or more on-road light and medium-duty vehicles. Rule 1191 also contains specified exemptions. (Rule 1191(f))

### 2. *Fleet Rule 1192*

Rule 1192 requires public transit fleet operators to acquire alternative-fuel heavy-duty vehicles [4] when procuring or leasing vehicles to reduce air toxic and criteria pollutant emissions. This Rule applies to public transit fleets with 15 or more public transit vehicle or urban buses, operated by government agencies or operated by private entities under contract to government agencies, that provide passenger transportation services. The Rule requires these fleet operators to acquire alternative-fuel vehicles when adding or replacing vehicles. Rule 1192 also contains specified exemptions. (Rule 1192(e))

### 3. *Fleet Rule 1193*

Rule 1193 requires public and private solid waste collection fleet operators to acquire alternative-fuel [5] refuse collection heavy-duty vehicles when procuring or leasing these vehicles. The Rule applies to government agencies and private entities that operate solid waste collection fleets with 15 or more solid waste collection vehicles. Acquisition of dual-fueled vehicles [6] is allowed for fleets of 15 or more transfer or rolloff vehicles.[7] Rule 1193 also contains specified exemptions. (Rule 1193(e))

### 4. *Fleet Rule 1194*

Rule 1194 applies to public and private fleet operators of 15 or more vehicles that transport passengers from commercial airports located in the District. The affected vehicles include taxis, shuttles, and limousines. The Rule requires passenger car, light-duty truck, medium-duty transit vehicle, and heavy-duty transit vehicle fleet operators to acquire cleaner burning or alternative-fueled vehicles [8] when procuring or leasing these vehicles in the District, unless otherwise exempt. Fleet operators using passenger cars or medium-duty vehicles to provide airport transportation services must purchase a specified percentage of vehicles that meet CARB's standards for ultra low emission vehicles. Fleet operators that use heavy-duty vehi-

---

not powered by gasoline or diesel fuel and emits hydrocarbon, carbon monoxide, or nitrogen oxides, on an individual basis at least equivalent to or lower than a ULEV based on [C]ARB's certification data." (Rule 1191(c)(1))

4. "Alternative-fuel heavy-duty vehicle" is defined as a "heavy-duty vehicle, urban bus or engine that uses compressed or liquified natural gas, propane, methanol, electricity, fuel cells, or other advanced technologies that do not rely on diesel fuel," and that meets the emissions requirements of the Urban Transit Bus Rule adopted by CARB. (Rule 1192(c)(1))

5. Under Rule 1193, "alternative-fuel heavy-duty vehicles" use compressed or liquefied natural gas, liquefied petroleum gas, methanol, electricity, fuel cells, or other advanced technologies that do not rely on diesel fuel. (Rule 1193(c)(1))

6. A "dual-fuel heavy duty vehicle" is a "heavy-duty vehicle equipped with a diesel engine that uses an alternative fuel ... in combination with diesel fuel to enable compression ignition. A dual-fuel engine typically used the alternative fuel to supply 85 percent of the total engine fuel requirement...." (Rule 1193(c)(2))

7. A "rolloff vehicle" is "any heavy-duty vehicle used for the express purpose of transporting waste containers such as open boxes or compactors." (Rule 1193(c)(5))

8. An "alternative-fueled vehicle" means "a light or medium-duty vehicle, or heavy-duty transit vehicle or engine that is not powered by gasoline or diesel fuel." (Rule 1194(c)(2))

cles must purchase alternative-fuel vehicles. Specified exemptions are provided for under this Rule as well. (Rule 1194(e))

### 5. *Fleet Rule 1186.1*

Rule 1186.1 requires certain public and private sweeper fleet operators to acquire alternative-fuel or otherwise less-polluting sweepers when purchasing or leasing these vehicles for sweeping operations undertaken by or for governments or governmental agencies in the District's jurisdiction. Rule 1186.1 also requires government agencies that contract for sweeping services to solicit bids or contract for services that use alternative-fuel sweepers. An "alternative-fuel sweeper" is one with "engine(s) that use compressed or liquefied natural gas, liquefied petroleum gas (propane), methanol, electricity, or fuel cells. Hybrid-electric and dual-fuel technologies that use diesel fuel are not considered alternative-fuel technologies for the purposes of this rule." (Rule 1186.1(c)(2)) Specified exemptions are also provided for. (Rule 1186.1(f))

### 6. *Fleet Rule 1196*

Rule 1196 requires public fleet operators of heavy-duty vehicles to acquire alternative-fuel heavy-duty vehicles when procuring or leasing these vehicles. The Rule applies to all government agencies located in the District and to any special districts such as water, air, sanitation, transit, and school districts, with 15 or more heavy-duty vehicles. These operators must acquire alternative-fuel vehicles, dual-fuel vehicles, or dedicated gasoline vehicles when adding or replacing heavy-duty vehicles. Specified exemptions are provided for under the Rule as well. (Rule 1196(f))

### E. *Procedural History*

On November 21, 2000, Plaintiff EMA filed its First Amended Complaint against the SCAQMD Defendants for declaratory and injunctive relief, challenging the constitutionality of the Fleet Rules. Specifically, Plaintiff EMA claims the Fleet Rules violate Sections 209 and 177 of the federal Clean Air Act, 42 U.S.C. §§ 7543 and 7507, as well as the Supremacy Clause of the United States Constitution, U.S. Const. Art. VI, cl. 2, and are therefore preempted as a matter of law. On January 17, 2001, Plaintiff–in–Intervention WSPA also brought suit against the SCAQMD Defendants and the Environmental Intervenors for declaratory and injunctive relief, claiming the Fleet Rules violate CAA §§ 209 and 177 and the Supremacy Clause.[9]

On March 23, 2001, Plaintiffs and Defendants filed cross motions for summary judgment. Plaintiffs moved for summary judgement on counts one (1) through six (6) of their respective Complaints.[10] On April 20, 2001 California Attorney General Bill Lockyer submitted an *amicus curiae* brief on behalf of the State of California in support of Defendants' Motions for Summary Judgment and in opposition to Plaintiffs' Motions for Summary Judgment.

The parties have stipulated that this case should be adjudicated on the pleadings, as no material factual disputes are at issue. The case turns entirely on the scope of the express preemption provisions of §§ 209 and 177 of the Clean Air Act. After considering the parties' written and oral arguments, the Court issues the following decision:

---

9. Plaintiff EMA and Plaintiff–in–Intervention WSPA will hereinafter collectively be referred to as "Plaintiffs." The SCAQMD Defendants and Defendants–in–Intervention Environmental Intervenors will hereinafter collectively be referred to as "Defendants."

10. On July 25, 2001 the parties entered into a stipulated dismissal of count seven (7) of Plaintiff EMA's First Amended Complaint.

## II. Discussion

A. *CAA § 209(a)*

Section 209(a) of the Clean Air Act provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment. 42 U.S.C. § 7543(a).

Plaintiffs argue that the Fleet Rules violate CAA § 209(a) because they constitute "standard[s] relating to the control of emissions from new motor vehicles or new motor vehicle engines." Plaintiffs also assert that the Fleet Rules establish unlawful conditions precedent to the sale of new motor vehicles or engines.

■ The Court does not accept Plaintiffs' interpretation of the impact of the Fleet Rules. The Rules regulate the purchasing and leasing, not the sale, of vehicles by fleet operators. Fleet operators are required to purchase "cleaner" vehicles when adding or replacing fleet vehicles. The Fleet Rules accept as given the existing CARB vehicle standards; they merely require fleet operators to choose from among the least polluting of CARB-certified, available vehicles. The Rules impose no new emission requirements on manufacturers whatsoever, and therefore do not run afoul of Congress's purpose behind motor vehicle preemption: namely, the protection of manufacturers against having

to build engines in compliance with a multiplicity of standards. *See People of State of Cal. ex rel. State Air Resources Bd. v. Department of Navy*, 431 F.Supp. 1271, 1285 (N.D.Cal.1977), *aff'd by* 624 F.2d 885 (9th Cir.1980) ("The reasons given for the enactment of the pre-emption provision can be summarized as follows: to protect the manufacturer against having to build engines which would comply with a multiplicity of standards; to protect the vehicle owner from having to deal with different standards in each state in which he drives; to avoid the unnecessary duplication of federal standards; to avoid 'unnecessary expense' to the owner; and generally to avoid 'chaos' and 'confusion' ". (internal citations omitted)).

Furthermore, the Fleet Rules do not set a "standard relating to the control of emissions." Rather than imposing any numerical control on new vehicles, the rules regulate the purchase of previously-certified vehicles. Plaintiffs rely primarily on two cases to support their contention that the Fleet Rules constitute unlawful standards: *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196 (2d Cir.1998) and *Ass'n of Int'l Auto. Mfrs., Inc. v. Commissioner*, 208 F.3d 1 (1st Cir.2000). These cases hold that an attempt to limit the *sale* of vehicles is preempted. In *Cahill and Commissioner*, the states of New York and Massachusetts, respectively, adopted California's emission standards targeting ZEVs. Under the California regulations, two percent (2%) of all new vehicles certified for sale in California for model years 1998–2000, five percent (5%) for model years 2001–2002, and ten percent (10%) for model year 2003 were required to be ZEVs. California's program was granted a § 209(b) waiver by the E.P.A. in 1993, and New York and Massachusetts adopted the program pursuant to CAA § 177.[11] Both the Second

---

**11.** In *Cahill,* the state of New York adopted California's LEV program for light-duty vehi-

cles pursuant to the CAA's opt-in provision.

Circuit in *Cahill* and the First Circuit in *Commissioner* held that "the ZEV sales requirement must be considered a standard 'relating to the control of emissions.'" *Cahill*, 152 F.3d at 200; *Commissioner*, 208 F.3d at 6. The ZEV program mandated that a specified percentage of cars sold by manufacturers in any model year be ZEVs. "The ZEV sales requirement is, therefore, in the nature of a command having a direct effect on the level of emissions, rather than in the nature of a means of enforcing, or testing the effectiveness of, a command." *Cahill*, 152 F.3d at 200.

■ It does not follow, however, that a rule regulating the *purchase* of vehicles is such a standard. The Fleet Rules require purchasers to choose from among a subset of previously certified California vehicles. Where a state regulation does not compel manufacturers to meet a new emissions limit, but rather affects the purchase of vehicles, as the Fleet Rules do, that regulation is not a standard. No restriction on the sale of vehicles is present here. Plaintiffs may continue to sell any vehicle which is otherwise certified in California.

Furthermore, CAA § 246, 42 U.S.C. § 7586, expressly recognizes that Fleet Rules must be established in areas with particularly high pollution levels, and authorizes restrictions on the purchase of fleet vehicles to meet clean-air standards. Specifically, section 246 requires that "[e]ach state in which there is located all or part of a covered area...shall submit...a State implementation plan revision...to establish a clean-fuel vehicle program for fleets under this section." 42 U.S.C. § 7586(a)(1). Section 246 also mandates that "a specified percentage of all new covered fleet vehicles...purchased by each covered fleet operator in each covered area shall be clean-fuel vehicles and shall use clean alternative fuels...." 42 U.S.C. § 7586(b). It is not rational to conclude that the CAA would authorize purchasing restrictions on the one hand, and prohibit them, as a prohibited adoption of a "standard," on the other.

■ Additionally, through its Health and Safety Code, California has mandated these Rules be enacted by Districts with severe air quality problems. The South Coast Air Basin is the only "extreme" nonattainment area for ozone in the country. It is classified as a "severe" nonattainment area for particulate matter and has extremely high levels of toxic air pollution throughout the region. The California legislature enacted Health and Safety Code § 40447.5 in response to the need for the South Coast Air Basin to reduce pollution. Section 40447.5 authorizes the Dis-

New York's classification system, fleet average requirements, and ZEV sales requirements were identical, with one exception, to those of California for model years 1998–2003. That exception concerned medium-duty vehicles, which were included in California's ZEV requirements but not in New York's. Additionally, New York maintained the ZEV sales requirement for model years 1998–2002 even after California had abandoned it. The automobile manufacturers associations brought suit to prevent the enforcement of New York's 1998–2002 ZEV sales requirement.

In *Commissioner,* automobile manufacturers brought suit against the Massachusetts Department of Environmental Protection, claiming automobile emission standards adopted by the state of Massachusetts were preempted by the CAA. After California repealed its ZEV requirements for the model years 1998–2000, it entered into memoranda of agreements ("MOAs") with seven major automakers by which the manufacturers agreed to develop ZEV technology and introduce a limited number of ZEVS into the California market. In exchange, California agreed to provide infra-structural support for ZEV implementation. Massachusetts amended its ZEV mandates to reflect the automakers' obligations under the MOAs, but did not include the reciprocal obligations undertaken by California.

trict to "[r]equire operators of public and commercial fleet vehicles...in the south coast district, when adding vehicles to or replacing vehicles in an existing fleet or purchasing vehicles to form a new fleet, to purchase vehicles which are capable of operating on methanol or other equivalently clean burning alternative fuel and to require that these vehicles be operated, to the maximum extent feasible, on the alternative fuel when operating in the south coast district." Such state regulations are presumed to be valid. *See, e.g., Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (stating that the preemption analysis begins with the presumption that local police powers, such as air pollution prevention, are not preempted: "Throughout our history the several states have exercised their police powers to protect the health and safety of their citizens. Because these are 'primarily, and historically, ...matter[s] of local concern,' the 'States traditionally have had great latitude under their police powers to legislate as to the protection of the...health...of all persons.' ") (internal citations omitted) (cited in *Exxon Mobil Corp. v. U.S. Envtl. Prot. Agency,* 217 F.3d 1246, 1255 (9th Cir.2000)).

The Court therefore concludes that the Fleet Rules do not constitute unlawful standards "relating to the control of emissions."

### B. *Section 177*

Plaintiffs argue that the Fleet Rules violate CAA § 177, which provides:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Nothing in this section or in subchapter II of this chapter shall be construed as authorizing any such State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle".

42 U.S.C. § 7507.

■ As discussed earlier, CAA § 177 permits states other than California to "piggyback" onto California's standards if the state's standards are identical to California standards for which a waiver has been granted for a model year. Section 177, however, applies only to non-California "opt-in" states. The statutory language supports this conclusion. After first referring to states that adopt the California standards, section 177 declares that "any such state" is subject to certain limitations. The word "such" indicates that the statute is referring back to the non-California "opt-in" states. Section 177 has no application to the right of the District to regulate the purchase of fleet vehicles.

Furthermore, Congress' purpose in enacting § 177 is to prevent states from adopting and enforcing standards in a manner that would create a "third vehicle." *See Motor Vehicle Mfrs. Ass'n,* 17 F.3d at 528. Evident in the statutory scheme is

**1120**

Congress' desire not to burden manufacturers with "myriad state emission regulations." *Id.* at 531. Congress restricted states to duplicating either federal or California standards in order "to protect motor vehicle manufacturers from the undue burden of complying with more than two different regulatory schemes." *Am. Auto. Mfrs. Ass'n v. Comm'r*, 998 F.Supp. 10, 13 (D.Mass.1997) (quoting *Motor Vehicle Mfrs. Ass'n*, 810 F.Supp. at 1339).

> [Section 177] prevents opt-in states from imposing different emission requirements on new vehicles and engines that would place an undue burden on manufacturers by requiring them to produce materially different new vehicles for sale in such areas. To the extent that a manufacturer could demonstrate that each vehicle leaving the assembly line performs at levels to which it was certified, that manufacturers could claim 'undue burden' if a state that adopted the California standard applied enforcement procedures that would require materials [sic] changes in the manufacture of such vehicles, i.e., production of a third car.

Senate Comm. on Pub. Works, 103d Cong., 1st Sess., *A Legislative History of the Clean Air Act Amendments of 1990*, Serial No. 103–38, Vol. 1 at 1022. Therefore, "there can only be two types of cars in this country: 'California' cars or 'federal' cars. States cannot adopt any other standards which would require automakers to create a 'third' car." *Commissioner*, 998 F.Supp. at 13.

■ The Fleet Rules impose no such "third car" requirement. Rather, they require purchasers to choose from among a subset of previously certified vehicles. Automobile manufacturers will not be forced to do something more than they already must do. Restricting purchases to the types of engines already approved in California and for which a waiver has been granted will not violate § 177's "third ve-

hicle" prohibition. Section 177 bans any requirement for a third vehicle, not all requirements intended to reduce motor vehicle emissions. The CAA and its legislative history show that Congress limited the burden upon manufacturers to that of designing and manufacturing two versions of each motor vehicle, and no more. The Fleet Rules may lead to decreased demand for some cars and trucks certified for sale in California, but the Rules do not require the manufacturers to build or sell any particular model for this area. The Court concludes, therefore, that even if § 177 were to apply, the Fleet Rules do not run afoul of Congress' purpose in enacting § 177.

### III.  Conclusion

The Court concludes that the Fleet Rules are not preempted by § 209(a) of the Clean Air Act and are a valid exercise of the SCAQMD's authority. Section 177 does not apply to the District's Fleet Rules. Plaintiffs' Motions for Summary Judgment as to counts one through six of their Complaints are denied. Defendants' Motions for Summary Judgment are granted.

IT IS SO ORDERED.